**Certiorari Denied, February 16, 2011, Nos. 32,825/32,826**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-024**

**Filing Date: November 30, 2010**

**Docket No.  28,050**

**PHILLIP GRASSIE, as Personal Representative**
**and Executor of the Estate of WALTER GRASSIE,**

      **Plaintiff-Appellee,**

**v.**

**ROSWELL HOSPITAL CORPORATION,**
**d/b/a EASTERN NEW MEXICO MEDICAL**
**CENTER,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Ralph D. Shamas, District Judge**

Law Office of Stephen Durkovich
Stephen Durkovich
Santa Fe, NM

Garcia & Vargas, LLC
Ray M. Vargas, II
Santa Fe, NM

for Appellee

Montgomery & Andrews, PA
Stephen S. Hamilton
Jaime R. Kennedy
Santa Fe, NM

Sheehy, Serpe & Ware, P.C.
Richard A. Sheehy
Houston, Tx

1

for Appellant

**OPINION**

**BUSTAMANTE, Judge.**

**{1}** Walter Grassie died less than two hours after he was admitted to the emergency room at Eastern New Mexico Medical Center (Hospital) in Roswell, New Mexico. Mr. Grassie's personal representative sued the Hospital asserting that (1) the emergency room medical staff was medically negligent; (2) the Hospital was negligent in allowing the treating physician to practice in its facility; and (3) the Hospital misrepresented its emergency room services to the public contrary to the New Mexico Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2009). The district court allowed the three theories to be submitted to the jury. The jury awarded $1,986,931 in compensatory damages "[f]or the death of Walter Grassie" and $9,501.65 under the UPA. The jury also entered two separate punitive damages awards of $10,000,000 each, one premised on Plaintiff's medical malpractice count and the other based on the negligent hiring theory.

**{2}** The Hospital does not appeal the award of compensatory damages insofar as it is based on medical negligence. The Hospital does challenge the compensatory award to the extent it is based on the negligent hiring claim. The Hospital generally asserts that the punitive damages awards are not supported by substantial evidence and are excessive. More specifically, the Hospital asserts that (1) the punitive award flowing from any medical negligence cannot be grounded—as a factual or legal matter—on the cumulative conduct approach of *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 881 P.2d 11 (1994); and (2) there is no evidence of a sufficiently culpable state of mind with regard to the negligent hiring theory to allow the claim to be submitted to the jury.

**{3}** We agree with the Hospital that the claim for negligent hiring should not have been submitted to the jury, and we reverse as to that portion of the verdict and judgment. We affirm the remainder of the judgment.

**INTRODUCTION**

**{4}** The issues in this case revolve around three areas of inquiry—medical malpractice, negligent hiring, and the UPA matter. Because each area involves different facts and legal rules, we will discuss each separately, providing pertinent factual and procedural summaries as appropriate.

**I.     MEDICAL MALPRACTICE**

**{5}** Viewing the record in the light most favorable in support of the jury verdict, Mr. Grassie probably died of an aortic dissection, a process in which the inner wall of the aorta tears, allowing blood to be pushed in between the inner walls and the outer walls of the

2

vessel. The effect is to very painfully rip apart the walls of the vessel as blood continues to be pumped into the break. A classic symptom of aortic dissection is a sudden onset of chest pain radiating to the back as the tear progresses. A "big risk factor" for aortic dissection is high blood pressure.

## A.      Emergency Room Treatment

{6}      On August 19, 2005, Mr. Grassie was driving by himself from Ruidoso to Roswell when he began feeling pain in his chest. At about 3:40 p.m. the pain became severe enough that he pulled over and called 911. He also spoke with his wife. The ambulance reached him at approximately 4:10 p.m. The EMTs found Mr. Grassie sitting in his vehicle and fully conscious. Mr. Grassie reported chest pain radiating to his back which he rated as "9 out of 10" in terms of severity. The ambulance patient care record reflects that the first blood pressure reading obtained by the EMTs upon arrival was 260/120. This blood pressure level is "frighteningly high" or "scary high," raising concerns that the patient could suffer a stroke, a heart attack or a rupture of the lining in the blood vessels.

{7}      Within one minute of reaching Mr. Grassie, the EMTs gave him aspirin. Within six minutes of their arrival, the EMTs administered a sublingual nitroglycerin tablet to Mr. Grassie, followed by a second tablet seven minutes later, and a third five minutes after that. Mr. Grassie's blood pressure readings reflect a concomitant drop, reaching 170/100 by the time Mr. Grassie arrived at the Hospital's emergency room. Mr. Grassie was also administered four milligrams of morphine intravenously starting at 4:30 p.m. When he was triaged by Hospital personnel, Mr. Grassie reported his pain level at five out of ten.

{8}      The ambulance patient care record reflects that the ambulance reached the emergency room at 4:32 p.m. The first hospital records—reflecting a time of 4:43 p.m.—are the Initial Assessment Form and the Emergency Department Chest Pain Nursing Assessment. The Initial Assessment Form reflects that Mr. Grassie's blood pressure was 216/96 at that point, and his reported pain was still at 5 out of 10. He was still reporting chest pain radiating to the back. The Initial Assessment Form also reflects that Mr. Grassie reported having "substernal and crushing" pain radiating to his jaw, neck, and arm, and "syncope [fainting] or near syncope, dyspnea [shortness of breath], dyspnea on exertion, orthopnea and nausea or vomiting."

{9}      Mr. Grassie was assigned a priority level of "2" or "urgent" rather than "emergent" under the Hospital triage criteria. A patient assessed as "urgent" was not required to be seen by a doctor for an hour after arrival in the emergency room. A patient assessed as "emergent" was required to be seen "[a]s soon as [the doctor] can get in the room."

{10}      The triage nurse assigned Mr. Grassie to the urgent or priority two status because she decided he was stable at least in part because "[Mr. Grassie] was able to answer my questions." The triage nurse made the priority "2" assignment even though she was aware that, while Mr. Grassie's blood pressure and other symptoms had reacted positively to the EMTs treatment, with the passage of only a few minutes they were again increasing.

3

**{11}** The triage nurse thought Mr. Grassie was having a heart attack. As such, she entered "chest pain" into the computer, and the computer printed out a set of forms appropriate to that diagnosis. The forms are placed on a yellow clipboard with a room designation. The yellow clipboard alerts doctors and others that the patient has been designated "urgent." The EMT report may or may not be included on the yellow clipboard, and the triage nurse could not recall if Mr. Grassie's EMT report was attached to his clipboard. The EMT report was not part of the Hospital's records. The information from the EMTs did get entered into the triage notes.

**{12}** The standard protocol for a heart attack is a regimen of morphine, nitroglycerin, oxygen, and aspirin. The triage nurse started oxygen under her own authority but could not administer any other medications without a doctor's order. Another part of the standard protocol is a chest x-ray and the triage nurse ordered one at 4:45 p.m. The chest x-ray was performed at 4:50 p.m. X-rays are digitally transferred to a "pack system" upon being taken. The triage nurse also ordered standard blood work indicated by the chest pain protocol. All of the diagnostic orders made by the triage nurse were reflected on the medical record so they would be accessible to the doctor.

**{13}** The triage nurse had worked at the Hospital since 1998. The day Mr. Grassie came to the Hospital was the first day the nurse had worked with the treating doctor—Theodore Collins. She had not had any orientation sessions with him before he appeared to work that day, and she was not aware of any orientation programs for doctors and nurses in the emergency room.

**{14}** Neither the triage nurse nor the treating nurse even spoke to Dr. Collins about starting any medications or about reviewing Mr. Grassie's x-rays. They felt it was not their responsibility to do so. And neither of them even brought Mr. Grassie's blood pressure readings to Dr. Collins' attention. The treating nurse stated: "The physician can look at the monitor as easy as I can, sir."

**{15}** There are four particularly salient aspects of the treating nurse's testimony with regard to Mr. Grassie's blood pressure readings. First, he noted blood pressure readings for Mr. Grassie at least four times before Mr. Grassie "coded." There is a question, however, whether they were charted contemporaneously or after Mr. Grassie died. If they were not charted contemporaneously, the treating doctor would not have had the readings history available to him. Second, even though the blood pressure readings were "scary high" (224/106, 216/99, 218/112, 224/108), the treating nurse never reported them to the treating physician, Dr. Collins. Third, even though the monitoring equipment was set to issue an audible alarm when readings exceeded 170, the treating nurse could not recall the alarm ever sounding. The alarm feature could be turned off by the nursing staff. Fourth, the treating nurse did not recall a blood pressure reading of 280/146 even though the Grassie family testified they saw such a reading.

**{16}** The treating nurse was charged with administering medications per doctor orders. The Hospital record does not reflect when the order for medication was entered or given. The treating nurse could not recall when or how he received the order for medication, and

4

thus the time span from the time the order was received to the time the nitroglycerin drip was started could range anywhere from forty-three minutes to twenty minutes.

{17} In either event, Mr. Grassie did not receive any medications for a full hour after his arrival at the emergency room.

{18} The treating physician, Dr. Collins, first saw Mr. Grassie at 5:00 p.m. The emergency room Physician Record outlines his examination of Mr. Grassie. The record reflects Mr. Grassie's chest pain radiating to his back. The pain, rated at seven out of ten, was worsened by change in position and deep breathing and relieved by nitroglycerin. Dr. Collins noted no nausea, vomiting or shortness of breath—only sweating. Dr. Collins reviewed the nursing assessments and vital signs record.

{19} Dr. Collins was not confident that the reported blood pressure readings from the automatic cuff were accurate, but he never obtained a manual reading of his own to verify the range. Also, Dr. Collins did not dispute that Mrs. Grassie told him about the 280/146 blood pressure she had seen on the monitor. He did not know if the reading was accurate, but he did not do anything to verify it before Mr. Grassie died.

{20} Dr. Collins did not review the x-ray that had been taken by the time he first saw Mr. Grassie. Dr. Collins never asked to see x-rays and never inquired about their availability. In fact, the x-ray was not read until two and a half weeks later. When read, the radiologist suggested further CT testing to "consider dissecting aneurysm" if the patient had chest pain. Dr. Collins did not order any further testing and circled "Chest pain – *acute pericardial*" as his clinical impression. "Acute Aortic Dissection" and "Acute MI" are not circled, though Dr. Collins testified he kept them in the back of his mind. Dr. Collins stated that seeing the x-ray would not have changed his treatment.

{21} Further, Dr. Collins did not enter any order for medication on the ER Physician Record. The boxes for aspirin, ACE inhibitors, nitrates, beta blockers and thrombolytics were not checked. Dr. Collins testified he ordered a nitroglycerin drip after he saw Mr. Grassie and after Mrs. Grassie reported the 280/146 reading, but he could not recall how he conveyed the order to the nursing staff. The Physician Record did not reflect any times when medications were ordered. Despite these issues, Dr. Collins thought that Mr. Grassie's treatment "ran pretty smoothly."

## B.    Plaintiff's Expert Testimony

{22} Plaintiff's expert radiologist agreed with the x-ray assessment done two and a half weeks after Mr. Grassie's death, in particular the need for a CT scan. CT scans "can be done rapidly, faster than most radiologists can read them." They are a "definitive procedure" for diagnosing a possible dissection, which "directs the care of the patient from that point on."

{23} Plaintiff's cardiovascular surgery expert opined that Mr. Grassie died of a ruptured aortic dissection. "[H]e should have had his blood pressure brought to an acceptable level . . . 100 to . . . 120." Lowering his blood pressure could have been done very quickly,

perhaps "in seconds." Blood pressure could also be reduced safely, more gradually—say within twenty minutes. He also opined that the emergency personnel were negligent in not treating the high blood pressure sooner. In addition, he testified that the x-ray showing "a widened mediastinum in the face of a guy with hypertension" needed to be addressed "with an immediate CAT scan" if the hospital can do so. If not, the patient should be transported to a facility that can do appropriate treatment for a dissection. That assessment and decision should be made "[a]bout when you see the patient." Instead, Mr. Grassie "sat around with a real high blood pressure until his ultimate demise."

{24}    Plaintiff's expert in emergency room medicine testified that aortic dissection should have been the first candidate for a diagnosis, given the report of a sudden onset of chest pain radiating to the back with high blood pressure. Customary diagnostic procedures could be and should have been followed to help narrow diagnostic options. For example, chest x-rays could reveal a collapsed lung (which is also painful) or a widened mediastinum (which would indicate an aortic dissection). An EKG can help determine whether the person is having a heart attack. None of the diagnostic tools available to Dr. Collins were appropriately used.

{25}    The emergency room expert testified that: It was negligent and "unconscionable" that the chest x-ray was not reviewed. "That's just something you must absolutely do as a physician." There is no evidence from Dr. Collins' documentation in the Hospital records, that he ever "considered the diagnosis of aortic dissection." Mr. Grassie never received any of the lifesaving treatment that "we would have done for him to basically, if this wasn't aortic dissection, to save his life. And that treatment is quite simply lowering his blood pressure." It was medically negligent not to treat Mr. Grassie's high blood pressure independently of any diagnosis which might have applied. There were "real issues with communication" among the emergency room personnel with regard to documentation, reading blood pressure, and looking at x-rays. There was also an unfortunate culture of not talking among the Hospital's staff stifling the flow of information and allowing more mistakes to occur.

{26}    Finally, asked if not treating a blood pressure of 280/146 constituted conscious disregard for the patient's safety, the emergency room expert replied: "I think one of two things is happening, either Dr. Collins was consciously ignoring that combination of facts and the blood pressure and choosing not to treat it, or he was incompetent, slash, negligent and did not know what to do."

{27}    Plaintiff presented one other expert in emergency room medicine and procedures. Initially reluctant to "participate because it's a plaintiff case," he decided to get involved because "the case was very powerful." His testimony is best quoted rather than paraphrased.

> Q:    Having read the medical records, okay, what are the principle [sic] facts of your opinion?
>
> A:    The principle [sic] facts are that the real grade that needs to be given to the crew at [the Hospital], the ER crew, is an F. It is failure. Walter

Grassie did not need to die August 19th, 2005. As painful as this is to discuss, it just did not need to happen. Because he had a disease entity that was easily recognizable, that being aortic dissection, a condition of hypertension that was easily treatable at [the Hospital].

He had a condition that required teamwork which was absent. And most basic of all he had—there was a tool that was utilized that showed what was wrong with him, that being a chest x[-]ray that wasn't even looked at. So there was failure to recognize the disease process, failure to treat the disease process, and failure to do the most basic things that could have given him time. And in my opinion, could have allowed, would have allowed most probably for his survival.

Q: Okay. What are the facts that you feel should have compelled the physicians at [the Hospital] to recognize what was going on? In other words, what told them? What are the facts that told them what was going on?

A: Just two things. And one of those things was the nature of the pain, the severe sudden onset of the pain that made him slump over in his vehicle, associated with a blood pressure that was, as was mentioned by one of the nurses earlier, scary high, truly scary high, 260/140 over 120 rather, associated with that pain. And it's so classic for aortic dissection.

And then with a chest x[-]ray that proves that it's there, that's the second thing. That's all that was needed to make this diagnosis. Medicine is nothing but a balancing of possibilities. It's not really science. Some of us like to think it's science. But it's not. It's just balancing possibilities. What is the likelihood that something is going on.

Because of the type of pain he had and because of his chest x[-] ray, the likelihood that he had an aortic dissection was far and away evident. And his blood pressure, which of course is obvious, was easily treatable with medications that are in the [Hospital] ER.

. . . .

Q: All right. I will ask the simple question first. But was it negligent for Dr. Collins not to have read the chest x[-]ray?

A: Yes. Yes.

Q: Okay. How far out of normal, out of what's recognized practice, out of what's acceptable practice, is it to have an x[-]ray in this type of a situation where someone has chest pain, okay, chest pain that goes into their back, they have blood pressures in the ranges that are up there, and have an x[-]ray that's not read?

7

A:      I've never heard of it.  I've never seen it, never heard of it, never been associated with it.  It's basic.  It's blocking and tackling.  The chest x[-]ray was ordered prompted by the chest pain protocol at [the Hospital].  And that was appropriate.  But to think of ordering that because it's so basic—I mean, it goes back to 1890 when we were able to get chest x[-]ray.  This is not new science.  This is not rocket science.  To get it and not look at it is beyond description as far as negligence is concerned.  I mean, it's almost willful.  It was sitting right there on his computer screen.

Q:      For a patient who has chest pain that radiates to his back, who has a blood pressure above 210, 220, 230, 260, you know, up in that number, 280, okay, do you have an opinion about whether or not failing to look at that chest x[-]ray if you know a chest x[-]ray has been taken if that's in conscious disregard of that patient's safety?

        . . . .

A:      Well, conscious disregard.  Let me put it this way:  To me, that may be a legal term.  But here is what I would say, what I'm going to say about that, is that indeed one would have to conscious—well, one would have to consciously disregard.  One would have to ignore the fact that a chest x[-]ray was ordered and done.  One would have to actively not look at it.  It's just unimaginable.  I'm not overemphasizing this.

Q:      Would it be in disregard of the importance of the chest x[-]ray?  It is not just a chest x[-]ray, this is a critical chest x[-]ray, is it not?

A:      It's a critical chest x[-]ray.  It would be in disregard of the patient's safety.  It would be in disregard of the most basic teachings that any third-year medical student knows.  You order a test.  You look at it.  That's why you order it.  You order it for a reason.  And because it gives you information.

        And once you have that information, then you can act on it.  You can figure out what's going on.  And then hopefully you can treat it.  In this situation, it's my strong opinion that the chest x[-]ray shows the aneurysm, the dissection.  And it's a treatable condition.

Q:      Is it in conscious disregard of a patient's safety?  Was it in conscious disregard of Walter Grassie's safety that people—

        . . . .

Q:      —for the people at [the Hospital], this is the emergency room people, to not treat his blood pressure from the time he came in at 1632 until 1743 a whole hour later?

8

. . . .

A:      One would have to ignore that blood pressure in order not to treat it. One would have to essentially act as if it weren't present. And in my opinion, that's what happened.

This blood pressure, which was scary high from the very beginning and lasted all the way up until he had his cardiac arrest at 1757, was high enough to scream for treatment even without the chest pain. Even without the chest x[-]ray. And so one would have to purposefully not treat this in order for it to go on for an hour.

Q:      Is it medically negligent in your opinion? Was it medically negligent for the nurses at [the Hospital] not to bring to Dr. Collins's attention the fact that there was an x[-]ray there that hadn't been read?

A:      Yes. Yes. The concept that was discussed this morning about teamwork is true in the emergency room. And part of the F grade that I'm giving to the activity in this case is the failure to communicate.

In order to have teamwork—therefore a failure of teamwork. In order to have teamwork, we, in the ER have to communicate. The nurse has to be able to tell the doctor, "A family member said that the blood pressure was 280, or that [the] blood pressure is now 230/110, the chest x[-]ray has been done." All of these things are how we function in the emergency room.

Q:      Okay. You can't overlook things; is that right?

A:      You can't overlook things. And you can't do it all yourself. You have to do it this way in the emergency room. That's why it's such a neat way to practice medicine. Is you rely on each other. And that was completely absent in this case.

## C.      Analysis

**{28}**      As noted above, the Hospital does not appeal the award of compensatory damages based on medical negligence. In addition, the Hospital insists it is not asserting a substantial evidence challenge to the punitive damages award. Our only task is to determine whether the punitive damages award can stand as a matter of law. We are persuaded that on this record it can.

**{29}**      The Hospital advances four arguments: (1) *Clay v. Ferrellgas* has not been recognized as a viable theory of liability for punitive damages, (2) UJI 13-1827 NMRA should not have been modified and the jury instruction given did not accurately reflect *Clay's* rationale, (3) the punitive damages award fails as a matter of law because the jury

9

found no proximate cause as to the nurses' conduct, and (4) the award is excessive and contrary to due process. We address each in turn.

### 1. The Viability of *Clay v. Ferrellgas*.

**{30}**   The Hospital makes the narrow and technical argument that *Clay's* "cumulative conduct" theory has not been accepted in New Mexico because it has not been incorporated into the punitive damages uniform jury instructions. The cumulative conduct theory provides that an award of punitive damages against a corporation may be based on "the actions of the employees [viewed] in the aggregate [in order] to determine whether [the employer corporation] had the requisite culpable mental state because of the cumulative conduct of the employees." *Id.* at 270, 881 P.2d at 15. The Hospital notes that UJI 13-1827 has been amended twice since *Clay* was decided—substantially in 1998 and slightly in 2008—and yet the instruction does not reflect a "cumulative conduct" method of proof against employers. The Hospital deduces from this happenstance that "Direct Liability" and "Vicarious Liability," as described in UJI 13-1827, are the only routes available to impose punitive damages on an employer.

**{31}**   We reject the Hospital's premise. Just because a theory of recovery has not been incorporated into a uniform instruction does not mean that the theory, which was previously recognized by our Supreme Court and is binding on this Court, is suddenly invalid. The UJI itself recognizes this. UJI 1-051(F) NMRA (recognizing that courts may instruct on a subject, even in the absence of an applicable uniform instruction); *see Payne v. Hall*, 2006-NMSC-029, ¶ 37, 39 n.5, 139 N.M. 659, 137 P.3d 599 (noting that "there were no [u]niform [j]ury [i]nstructions on successive tortfeasor theory" and proposing language for review and adoption by the UJI-Civil committee).

**{32}**   Further, *Clay* has not been overruled or even criticized. It was cited with approval in *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 21, 140 N.M. 478, 143 P.3d 717, as a way in which a "corporation may be held liable for punitive damages for the misconduct of its employees." We understand full well that the *Clay* approach was not applied in *Chavarria*, but we doubt the Supreme Court would include a defunct theory of liability in a general statement of available approaches. More to the point, *Clay* has been applied in two cases. In *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶¶ 47-48, 127 N.M. 47, 976 P.2d 999, the Court relied on *Clay's* cumulative conduct theory to analyze whether the record included substantial evidence "to support the jury's verdict of intentional infliction of emotional distress and to warrant punitive future damage awards." Similarly, in *Atler v. Murphy Enterprises, Inc.*, 2005-NMCA-006, ¶¶ 16-22, 136 N.M. 701, 104 P.3d 1092 (filed 2004), this Court relied on *Clay* to support and explain our review of the record and our affirmance of a punitive damages award against corporate defendants. *Clay* is a healthy part of New Mexico's tort law.

### 2. The Jury Instruction.

**{33}**   The jury was given the following instruction concerning punitive damages:

In this case, Phillip Grassie seeks to recover punitive damages from [Hospital]. You may consider punitive damages only if you find that Phillip Grassie should recover compensatory damages.

If you find that the conduct of Rich Robinson, the CEO of [Hospital], was willful, reckless, or wanton, then you may award punitive damages against it.

If you find that the combined acts or omissions of Pamela Hayes Rodriguez, and/or Brian Miller, as employees, and [Dr.] Collins, as the apparent agent, of [Hospital] amounted to willful, reckless, or wanton conduct, you may award punitive damages against [Hospital].

Willful conduct is the intentional doing of an act with knowledge that harm may result.

Reckless conduct is the intentional doing of an act with utter indifference to the consequences.

Wanton conduct is the doing of an act with utter indifference to or conscious disregard for a person's safety.

**{34}** The Hospital makes two arguments with regard to the instruction. First, it argues that the district court erred as a matter of law in revising UJI 13-1827 to exclude its language describing vicarious liability. The Hospital's basic theory was and is that *Clay's* "cumulative conduct" approach cannot be used to negate the need for proof of managerial capacity or ratification in order to impose punitive damages on employees. As we demonstrate above, *Clay* allows another way to establish employer liability. As such, the Hospital's first argument fails.

**{35}** Second, the Hospital argues that the instruction given does not accurately reflect the *Clay* rationale. The Hospital now argues that the instruction is wrong because under *Clay* the "question is not whether the nurses or Dr. Collins engaged in 'willful, reckless, or wanton conduct,' but rather, whether their cumulative actions or inactions indicated that . . . Hospital had a culpable mental state."

**{36}** We decline to address this argument because the Hospital failed to preserve it below. We have reviewed the record of all the discussions between counsel and the district court concerning the punitive damages instruction and we find no argument by the Hospital that the instruction given did not accurately reflect the *Clay* theory. In context, the Hospital's final objection that the instruction "misstates the law" clearly refers to the general argument that the vicarious liability grounds were being omitted. And even as to that ground, the objection by itself would have been insufficient. *Budagher v. Amrep Corp.*, 97 N.M. 116, 119, 637 P.2d 547, 550 (1981) (noting that "mere assertion that the given instruction is not an accurate statement of the law is insufficient to alert the mind of the trial judge to the claimed vice of the instruction").

11

**{37}** Nothing the Hospital argued below can fairly be said to have alerted the district court's mind to the argument made on appeal. This failure to alert the district court—and opposing counsel—to the objection now being made implicates the core rationale of our preservation rules. As we noted in *Hinger v. Parker & Parsley Petroleum Co.*, 120 N.M. 430, 440, 902 P.2d 1033, 1043 (Ct. App. 1995):

> Fairness underlies the rule of preservation of error. Each party to a lawsuit has only one opportunity to present its case and challenge the case of its opponent; that occurs at trial, and not for the first time on appeal. Objections to a theory of recovery and the sufficiency of the factual allegations underlying it must be brought to the [district] court's attention. Moreover, the objection on appeal cannot change from that argued to the [district] court. This is particularly true for challenges to jury instructions.

(citations omitted). The Hospital's objections below[1] were based only on the applicability of *Clay* to the case and not the description of the *Clay* approach in the instruction given. As such, the instruction is the law of the case and is not vulnerable to attack on this new ground. *Montgomery Ward v. Larragoite*, 81 N.M. 383, 386, 467 P.2d 399, 402 (1970); *see Atler*, 2005-NMCA-006, ¶¶ 6-11.

**3.      The Effect of the Jury Finding of no Proximate Cause as to the Nurses.**

**{38}** In response to questions on the special verdict form, the jury found that the nurses were negligent but also determined that their negligence was not a proximate cause of Mr. Grassie's death. The Hospital argues that as a result of the jury's finding, the *Clay* concept of cumulative conduct simply cannot apply because there is only one tortfeasor, Dr. Collins. To apply *Clay* in this circumstance, the Hospital asserts, would result in imposing punitive damages on it for the acts of one employee without any finding of managerial capacity for the doctor or a finding of ratification. The underlying assumption of this argument is that the nurses' conduct was not considered by the jury and cannot be taken into account on appeal in evaluating the Hospital's state of mind and the award of punitive damages against it.

**{39}** The Hospital misinterprets *Clay*. *Clay* did not alter New Mexico's general rule that punitive damages are not imposed on an employer for the acts of an employee as a matter of simple respondeat superior. *Gillingham v. Reliable Chevrolet*, 1998-NMCA-143, ¶ 20, 126 N.M. 30, 966 P.2d 197, *overruled on other grounds by Fernandez v. Espanola Pub. Sch. Dist.*, 2005-NMSC-026, 138 N.M. 283, 119 P.3d 163. Rather, there must be proof in some form of the employer's own culpable state of mind and conduct. *Id.* Prior to *Clay*, imposition of punitive damages on an employer—particularly a corporation—required either (1) proof that the employee-tortfeasor possessed and was exercising managerial capacity, *Albuquerque Concrete Coring Co. v. Pan Am World Services., Inc.*, 118 N.M. 140, 145-46, 879 P.2d 772, 777-78 (1994); or (2) the employer through other managerial employees

---

[1]This is true even in its motion for a new trial.

12

ratified, accepted, or acquiesced in the conduct of the tortfeasor. *Chavarria*, 2006-NMSC-046, ¶¶ 30-33.

**{40}** *Clay* provided an alternative method of proving a culpable mental state on the part of the employer. In *Clay*, the plaintiffs were injured when propane fumes from an improperly installed propane tank infiltrated the passenger compartment of a car and ignited. The testimony revealed that one employee, Candelaria, performed the improper installation work while the other employee, Schell, released the car without verifying the actual status of the installation work. Neither employee warned the plaintiffs concerning the dangers potentially posed by the incomplete installation. In addition, there was testimony that this second employee routinely failed to file a State-required form with the State inspector's office. The form was required in order to allow the inspector an opportunity to double check the installer's work.

**{41}** *Clay* was submitted to a jury on four alternate theories of liability: two based on the improper installation and two based on Ferrellgas's employees' failure to warn of the hazards caused by the improper installation. Both Candelaria and Schell were named in the jury instructions, though only Candelaria was actually joined as a party defendant. The jury awarded compensatory and punitive damages, and judgment on the verdict was entered against Ferrellgas and Candelaria jointly and severally.

**{42}** On appeal, this Court reversed the punitive damages award. *Clay v. Ferrellgas, Inc.*, 114 N.M. 333, 338-39, 838 P.2d 487, 492-93, *rev'd by Clay*, 118 N.M. at 272, 881 P.2d at 17. The Court of Appeals approach was to analyze the acts of each employee separately. In addition, this Court refused to infer any knowledge by the employees of each others' acts or failures to act. Finally, this Court's opinion held that the evidence as to the failure to file the State-required form could not be relied on to support the punitive damages award because the jury had not been instructed on the failure as a theory of liability. *Id.*

**{43}** The Supreme Court reversed the Court of Appeals, disagreeing with the manner in which the trial evidence had been reviewed and marshaled.[2] The Supreme Court noted: "The Court of Appeals incorrectly compartmentalized the conduct of the Ferrellgas employees. It should have viewed the actions of the employees in the aggregate to determine whether Ferrellgas had the requisite culpable mental state because of the cumulative conduct of the employees." 118 N.M. at 270, 881 P.2d at 15.

**{44}** The Supreme Court explained the anomalous effect of viewing the employees' conduct in isolation as follows:

> The Court of Appeals exonerated Ferrellgas from paying punitive damages
> because neither Candelaria nor Schell knew what the other was doing. If we
> follow this analysis, Ferrellgas escapes liability because its employees failed
> to communicate with each other. The culpable mental state of the

---

[2]That portion of *Clay* dealing with the concept that as the risk of danger increases, the duty of care also increases is not applicable here.

corporation, however, may be inferred from the very fact that one employee could be ignorant of the acts or omissions of other employees with potentially disastrous consequences.

*Id.* at 271, 881 P.2d at 16 (citation omitted).

**{45}** The question raised by the Hospital's argument is: What evidence is properly available to be aggregated by the jury—and thus by this Court—to determine the presence of a culpable mental state? The answer is provided by the Supreme Court's ruling in *Clay* with regard to the evidence about the failure to file the State-required forms. The Court held that this evidence could be used to assess corporate mental state even though it had not been presented as a theory of liability. *Id.* at 272 n.4, 881 P.2d at 17 n.4. The jury is not precluded from considering such background or contextual evidence in its deliberations. Such background or contextual evidence need not be about acts which are a proximate cause of the plaintiff's damages, and the background evidence need not constitute a completed tort.

**{46}** Here the jury found that the nurses' conduct did not constitute a completed tort. But under *Clay*, that does not mean that the evidence about what they did and failed to do cannot be taken into account in assessing the Hospital's mental state. Once the medical negligence claim was established, the full panoply of admitted evidence was available to assess the separate issue of the Hospital's responsibility as an entity. *Id.*

**{47}** Again, the Hospital does not argue that the full record is insufficient to merit a punitive damages award. Similarly, we are confident in concluding that there is substantial evidence supporting a punitive damages award based on medical negligence. A reasonable jury could conclude that the record paints a scenario of aggravated patient neglect broad enough in its sources to support finding a culpable mental state on the part of the Hospital.

**4.      The Punitive Damage Award Does Not Violate Due Process.**

**{48}** Whether an award of punitive damages is reasonable and comports with constitutional due process is a question of law which we review de novo. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶ 19, 132 N.M. 402, 49 P.3d 662. As we have noted, however, de novo review in this context is somewhat limited. To date at least, we have not undertaken to "ourselves determine the actual award of punitive damages." *Jolley v. Energen Res. Corp.*, 2008-NMCA-164, ¶ 31, 145 N.M. 350, 198 P.3d 376. In addition, in the course of our review, any doubts we may have "concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict." *Aken*, 2002-NMSC-021, ¶ 19.

**{49}** Following *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996), our review takes three criteria into account: "(1) the degree of reprehensibility of the defendant's misconduct[,] (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award[,] and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in

comparable cases." *Aken*, 2002-NMSC-021, ¶ 20. Of these, reprehensibility is the "most important indicium of the reasonableness of a punitive damages award." *Chavarria*, 2006-NMSC-046, ¶ 37 (internal quotation marks and citation omitted).

## A.     Reprehensibility

**{50}**     The commonly considered factors used by courts to measure reprehensibility include whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto Ins. Co. v. Campell*, 538 U.S. 408, 409. The inquiry is concerned with the social odium which should be attached to the defendant's conduct. The applicability of the factors is obviously fact and case dependent. *See Jolley*, 2008-NMCA-164, ¶¶ 32-34 (finding three factors applicable where the defendant had failed to barricade a natural gas wellhead for an extended time, resulting in the plaintiff's decedent hitting it and dying from the resulting explosion); *Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 34, 137 N.M. 80, 107 P.3d 520 (finding punitive damages award appropriate when the defendant acted with "intentional malice" in depriving another realtor of its commission); *Atler*, 2005-NMCA-006, ¶ 24 (approving punitive damages award for the defendant's failure to meet its contractual obligation to inspect carnival rides daily).

**{51}**     The Hospital makes two arguments with regard to the issue. It halfheartedly asserts that the historical facts describing the events in the emergency room which culminated in Mr. Grassie's death are not serious enough to warrant exemplary damages. The Hospital also argues that the award here is based on injuries or wrongs assertedly inflicted on nonparties and is thus contrary to *Phillip Morris USA v. Williams*, 549 U.S. 346 (2007). We address each in turn.

**{52}**     We characterize the Hospital's first argument as halfhearted for two reasons. First, the Hospital wholly fails to address the evidence. If the Hospital were making a pure substantial evidence argument we would reject it out of hand for its clear failure to comply with Rule 12-213(A)(4) NMRA. Out of an abundance of caution, giving some credence to the Hospital's assertion that the argument is one of law, we reject the argument as such. The Hospital asserts that whatever the facts are, they do not fit or meet three of the *State Farm Mut. Auto Ins. Co.* factors. The Hospital fails to acknowledge or discuss the application of the most obvious factor: whether the tortious conduct evinced an indifference to or reckless disregard of the health of others. We have already noted our view that a reasonable jury could view the events of August 19, 2005, as an aggravated instance of patient neglect. We agree with that assessment. The facts are sufficient to support an award of punitive damages.

15

**{53}** The Hospital's second argument based on *Phillip Morris* fails on factual and legal grounds. Broadly speaking, *Phillip Morris* prohibits punishing a defendant for injury it may have inflicted on nonparties to an action. The Hospital argues that Plaintiff's "indiscriminate attack on Chaves Emergency Group" (Dr. Collins' employer), and the reference to the Hospital's parent corporation during closing argument, show that the punitive damages award here was based on injuries inflicted on others. On their record, we simply disagree. The murky testimony concerning the status of Dr. Collins' employer was relevant to the issues surrounding his hiring and his status as an apparent agent or employee of the Hospital. In any event, there was no testimony that Chaves Emergency Group itself committed any torts against or harmed anyone else. We fail to see how this testimony contributed to the punitive damages award or runs afoul of *Phillip Morris*.

**{54}** Similarly, we fail to see how remarks made during closing argument about the Hospital's parent corporation run afoul of *Phillip Morris*. The vast majority of Plaintiff's 60-page closing argument dealt with the events of the day. The rhetorical flourish the Hospital relies on does not include any reference to injuries done to others. It does remind the jury of the larger corporate context it is dealing with in setting the amount of any award it might choose to make. That larger context would be relevant to consideration of the deterrent effect an award might have. Further, concerns about the public safety aspects of a defendant's conduct have not been precluded by *Phillip Morris*, 549 U.S. at 350 (noting there is no constitutional violation in using punitive damages to punish and deter conduct). *See Grefer v. Alpha Technical*, 2002-CA-1237, p. 7 (La. App. 4 Cir. 8/8/07); 965 So. 2d 511, 517 (holding that jury instruction allowing punitive damages "to compel the defendant to have 'proper regard for the rights of the public'" was proper under *Phillip Morris*).

**{55}** Finally, we must assume that the jury properly followed its instruction. Our UJI 13-1827 specifically warns the jury that any amount it awards "must be reasonably related to the injury and to any damages given as compensation and not disproportionate to the circumstances."

## B.    Proportionality of the Award

**{56}** The second criterion under *BMW of North America, Inc.* considers the relationship between the damage actually suffered by the plaintiff and the size of the punitive damages award. *Aken*, 2002-NMSC-021, ¶ 23. The compensatory award and the punitive damages award must bear a rational relationship to each. The United States Supreme Court has refused to date to impose a bright line ratio that a punitive damages award cannot exceed. *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425. It has noted, however that "[s]ingle-digit multipliers are more likely to comport with due process" while acknowledging that single-digit multipliers might not be appropriate in egregious cases. *Id.* at 410. Whether an award of punitive damages is "grossly excessive" in comparison to the damages suffered by the plaintiff is—within these imprecise boundaries—dependent on the circumstances of each case. *Id.* at 409.

**{57}** In this case, the ratio is just slightly greater than 10 to 1; the compensatory award tied to medical negligence is $993,465 and the punitive damages award is $10,000,000. This

award is thus on the outer edge of the range that could be considered perhaps presumptively acceptable. But it is not so large as to raise concerns of constitutional dimension. The testimony detailing the medical negligence that resulted in Mr. Grassie's painful death is a compelling narrative. The New Mexico Supreme Court affirmed a ratio of 7.4 to 1 in an insurance bad faith context involving improper premiums charges. *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 49, 127 N.M. 1, 976 P.2d 1. This Court approved a 6.76 to 1 ratio in a wrongful death case. *Jolly*, 2008-NMCA-164, ¶ 38. We see no constitutional defect created by the slightly higher ratio found in this case.

## C.    Comparable Penalties

**{58}**    The third criterion under *BMW of North America, Inc.* requires us to "[c]ompar[e] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *Aken*, 2002-NMSC-021, ¶ 25 (first alteration in original) (internal quotation marks and citation omitted). New Mexico has noted that this criteria "has been criticized as ineffective and very difficult to employ." *Id.* First, there is the problem of identifying "substantial legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (internal quotation marks and citation omitted). Second, there is the danger that a civil penalty—even for comparable conduct—may be too low to have a reasonable deterrent effect. *Id.* As a result, New Mexico and other courts have not applied this factor vigorously. *Id.* ¶ 26; *Buell-Wilson v. Ford Motor Co.*, 73 Cal. Rptr. 3d 277, 321 (Cal. Ct. App. 2008), *review granted and superseded by* 80 Cal. Rptr. 3d 27 (2008); *cert. denied*, 130 S. Ct. 742 (2009).

**{59}**    The Hospital argues that the legislative sanctions for violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2003), which mandates that hospitals give appropriate medical screenings and that hospitals stabilize patients before discharge or transfer, provides the best guidance for the appropriate measure of punitive damages. EMTALA provides for a civil penalty up to $50,000 for violations. 42 U.S.C. § 1395dd(d)(1)(A).

**{60}**    We disagree. EMTALA was designed as a means to encourage equitable screening for emergency medical conditions and to discourage "patient-dumping" by hospitals—the practice in which hospitals inappropriately move usually uninsured patients to other facilities. *Ward v. Presbyterian Healthcare Servs.*, 72 F. Supp. 2d 1285, 1291 (D.N.M. 1999); *Godwin v. Mem'l Med. Ctr.*, 2001-NMCA-033, ¶ 81, 130 N.M. 434, 25 P.3d 273. It was not designed or intended to address potential tort liability of any kind to admitted patients who suffer injuries as a result of medical negligence. The "appropriate medical screening" required by EMTALA is not evaluated in terms of its medical efficacy, but rather whether it is performed equitably as compared with other patients. *See Scott v. Dauterive Hosp. Corp.*, 02-1364, p. 19 (La. App. 3 Cir. 4/23/03); 851 So. 2d 1152, 1166 (internal quotation marks and citation omitted).

**{61}**    In addition, the penalty provided by EMTALA is simply too low to serve as a deterrent. It is obvious that adding a five percent "penalty" on top of the compensatory award in this case would have a de minimis effect. It would not even be as much as the

17

yearly interest accruing on the compensatory award during this appeal. As such, it is not helpful to the analysis or resolution of the case.

## II.   NEGLIGENT HIRING

**{62}**   The "theory-of-the-case" instruction given to the jury included the assertion that the Hospital "was negligent in allowing [Dr.] Collins to work in its emergency room." Characterizing the claim as a matter of negligent credentialing, the Hospital's primary argument here is that the claim should not have been submitted to the jury at all because Plaintiff failed to present any expert evidence concerning the standard of care applicable to the Hospital's decision-making process. Plaintiff argues that expert testimony was not needed because the claim was for ordinary negligence, not negligent credentialing. We conclude that in the context of this case, expert testimony was required to guide the jury concerning the applicable standard of care and its breach. Given that Plaintiff did not submit such evidence, the claim should not have been submitted to the jury, and we reverse the compensatory and punitive awards incident to the negligent hiring claim.

## A.   Facts and Proceedings

**{63}**   Count IV of the first amended complaint is entitled "Negligent Hiring and Negligent Management of the Emergency Room Department." Among other allegations, the first amended complaint asserted that Dr. Collins "was not qualified to work in an emergency room and, had [the Hospital] made any inquiry on its own, it would have known that." At trial, Plaintiffs honed the argument to two basic points:

> 1.   Rich Robinson, as chief executive officer of the Hospital, was negligent when he accepted Dr. Collins to work in the Hospital emergency room even though (a) the contract under which he was accepted required that doctors providing services "[s]hall be certified by the AMA/AOA recognized Board in the specialty indicated or eligible for certification by such Board by virtue of having successfully completed all educational and residency requirements required to [sic] it for the Board examinations."

> 2.   Mr. Robinson failed to adequately investigate Dr. Collins' employment; in particular his early release from his term as an Air Force doctor and the non-renewal of his privileges at other hospitals in the past.

**{64}**   The contract Plaintiff relies on is the Emergency Services Agreement the Hospital entered into with Chaves Emergency Group (Chaves) to provide "Emergency Medical Services" to the Hospital. Broadly speaking, the Agreement describes the terms under which Chaves would provide doctors to staff the Hospital's emergency room. Plaintiff focuses on two provisions of the Agreement: Section 1.1.3.1, which requires that any doctor proposed by Chaves "[m]ust be accepted by the Facility's Chief Executive Officer"—Mr. Robinson; and (2) Section 1.1.3.3, substantially quoted above in paragraph 63. Plaintiff's theory at trial

and here is that these provisions of the Agreement set the standard of care for Mr. Robinson's action in allowing Dr. Collins to work in the Hospital's emergency room.

{65}    It is undisputed that Dr. Collins was not board certified in emergency medicine by either the AMA or the AOA.  He was board certified in family practice by the AOA.  He was also certified in emergency medicine by the American Association of Physician Specialists in 1995.  Mr. Robinson himself did not have any information about Dr. Collins' prior work history before he accepted him to work pursuant to the Agreement with Chaves.  Mr. Robinson relied on the recommendation he received from the Hospital's medical staff to grant Dr. Collins "Locum Tenens" privileges starting August 19, 2005.  "Locum Tenens" is the term used to describe full, though temporary, privileges to practice at the Hospital. The decision of the medical staff was based on a full application from Dr. Collins, including licensing, confirmation of privileges at other hospitals, and a data bank query used to identify any malpractice claims—nationwide—against him.

{66}    At the time he applied for privileges at the Hospital, Dr. Collins had never had a malpractice action filed against him, and he held or had held privileges at hospitals in Artesia, Carlsbad, Clovis, and Ruidoso.  Privileges at these other facilities had been granted to him using the same process used by the Hospital.  Dr. Collins has practiced medicine since 1983, and for the vast majority of the time in emergency rooms.

{67}    Plaintiff's counsel questioned Dr. Collins about his history with regard to his service as a physician with the Air Force and the circumstances which led to his being asked not to return to work at two hospitals.  Dr. Collins described the discharge as a "mutual situation" brought on by his failure to recognize and follow military protocol with regard to calling in too many specialists to help in the emergency room.  In 1988 or so, Dr. Collins received an honorable discharge after serving only one year of a four-year enlistment.  Plaintiff did not call any witnesses to counter Dr. Collins' explanation.  With regard to the hospitals, Dr. Collins agreed with Plaintiff's counsel that he was asked to leave one hospital in Illinois because of a "problem with doing an IV stick."  Dr. Collins did not dispute Plaintiff's counsel's assertion that he was also asked to leave a hospital in Missouri because of undefined "trouble with the nurses."  The record does not reveal a time frame for Dr. Collins' departure from the latter facilities nor does it reveal any more detail about the incidents.

**B.      Expert Testimony Was Required In This Case**

{68}    Plaintiff's core argument on appeal is that expert testimony was not necessary because "[Plaintiff] made no negligent credentialing claim" as defined in UJI 13-1119B NMRA. Plaintiff characterizes his theory as simple or ordinary negligence flowing from Mr. Robinson's failure to enforce the Hospital's contract with Chaves to the letter and his failure to adequately delve into Dr. Collins' work history. Consistent with this assertion, Plaintiff's answer brief does not cite to or rely on the foundational cases in New Mexico recognizing the "theory of hospital liability generally known as corporate negligence, which arises when the hospital has failed to take reasonable steps to determine the qualifications or competency of a practitioner to whom it has granted clinical privileges." UJI 13-1119B, committee cmt.;

19

*Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 1998-NMCA-017, ¶ 41, 124 N.M. 549, 953 P.2d 722 (filed 1997); *Diaz v. Feil*, 118 N.M. 385, 389-90, 881 P.2d 745, 749-50 (Ct. App. 1994).

**{69}** Plaintiff emphasizes that the jury instruction given on his claims was based on UJI 13-1119A NMRA, which deals with a hospital's duty of ordinary care to its patients. Plaintiff further notes that the Hospital did not request that UJI 13-1119B be given to the jury. UJI 13-1119B describes the duty hospitals have to "exercise reasonable diligence in obtaining and acting upon information concerning the competence of [applicants to] its staff." The Hospital does not dispute it failed to request that UJI 13-1119B be given. As such, the Hospital did not preserve error as to the giving of UJI 13-1119A, and the instruction is the law of the case. *Andrus v. Gas Co. of N.M.*, 110 N.M. 593, 597, 798 P.2d 194, 198 (Ct. App. 1990).

**{70}** Contrary to Plaintiff's argument, however, the fact that UJI 13-1119A was given does not by itself resolve the question as to what type of evidence is necessary to prove the claim. In saying this, we are fully aware that the Use Note for UJI 13-1119A indicates that the "first paragraph" of the instruction—the one given to the jury—"relates to conduct which can be evaluated by the jury without the aid of expert testimony." We, of course, do not disagree that the Use Note accurately reflects the overall design of the instruction. But we are not—and the district court was not—considering or applying the instruction in a vacuum.

**{71}** Plaintiff's claim is that the Hospital, through Mr. Robinson, was negligent in allowing Dr. Collins to work as a doctor in its emergency room. The essence of the claim involves negligence in granting staff privileges to a doctor. The essence of the claim must inform the inquiry as to the applicable standard of care and the nature of the evidence necessary to elucidate the standard of care and its breach. Proof may or may not require expert testimony depending on the circumstances of a particular case, but use of UJI 13-1119A to instruct the jury should not by itself foreclose the inquiry. The instruction does not transform the basic nature of the claim being made. Plaintiff cannot escape the implications inherent to his claim of negligence in hiring a doctor.

**{72}** New Mexico, as noted above, has adopted the concept of direct liability on the part of hospitals for negligence in granting staff privileges to doctors. *Feil*, 118 N.M. at 390, 881 P.2d at 750. *Feil* generally discussed what would be required to make a prima facie showing, but did not address the specifics of the type of evidence that would be required or suffice to prove such a claim. *Id. Eckhardt* similarly did not address the type of evidentiary showing that might be required.

**{73}** The Committee Commentary to both UJI 13-1119A and 13-1119B acknowledges the difficulty. "While there is a single standard of ordinary care . . . the type of testimony required to establish a breach . . . differs depending on the kind of conduct that is alleged to constitute a breach. . . . Where the issue is not within the common knowledge of jurors . . . expert testimony is required." UJI 13-1119A committee cmt. The Committee Commentary to UJI 13-1119B echoes these concerns and provides some limited guidance by way of hypothetical examples.

20

> Consistent with the approach taken in UJI 13-1119A, the [district] court
> should determine the need for expert testimony based on the kind of conduct
> that is alleged to constitute a breach of the duty. For instance, a case in
> which the hospital entirely failed to inquire about, or utterly ignored, the
> existence of prior malpractice judgments against the physician presents a
> situation that could likely be evaluated by a lay jury under ordinary
> negligence standards. *Cf. Eckhardt*, 1998-NMCA-017, ¶ 43. . . . On the other
> hand, a case in which the hospital relied on the medical judgments of
> physicians on its credentials committee, who recommended granting an
> application for clinical privileges after reviewing materials in the applicant's
> file, might require expert testimony on the question whether the committee
> reasonably should have known of deficiencies in the applicant's competency
> based on the materials reviewed.

UJI 13-1119B committee cmt.

**{74}**     Comparing these hypotheticals to this case leads us to conclude that we are not—and the jury below was not—dealing with a simple factual scenario that is within the ken of lay persons. The record does not reflect the kind of utter failure to investigate noted in the commentary. Dr. Collins filed a complete application seeking privileges, including all the material required by the Hospital's by-laws. The medical staff reviewed the application and checked a national database for past malpractice actions against Dr. Collins. The record does not reveal any malpractice claims against Dr. Collins prior to this case. The application reflected that Dr. Collins held staff privileges at three other eastern New Mexico hospitals; that he had been practicing medicine for about twenty years, and he was board certified in family practice by the AOA and board certified in emergency medicine by the AAPS.

**{75}**     After this review, the medical staff recommended to Mr. Robinson that Dr. Collins be granted staff privileges. Mr. Robinson relied on the recommendation in making his decision to accept Dr. Collins as a physician at the Hospital.

**{76}**     Plaintiff does not acknowledge, much less discuss, any of the facts just recounted in his answer brief. Plaintiff's approach to the case makes these facts irrelevant. Under Plaintiff's approach, the Agreement with Chaves and Mr. Robinson's failure to enforce it overshadows all other facts and considerations. Under Plaintiff's theory, the Agreement by itself defines the standard of conduct applicable to the case, and Mr. Robinson's failure to enforce it provides all the evidence of breach necessary to carry his burden of proof.

**{77}**     We disagree. First, we doubt that the Agreement by itself can or should be used to set the definitive standard of conduct against which the Hospital's action must be measured. *See Titchnell v. United States*, 681 F.2d 165, 173 (3rd Cir. 1982) ("Mere failure to act in accordance with one's own internal procedures, however, will not automatically thereby render a health care facility negligent."); *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004) (noting that self-imposed or internal policies by themselves do not determine the governing standard of care); *Pedroza v. Bryant*, 677 P.2d 166, 170-71 (Wash. 1984) (en banc) (noting that the accreditation standards of the Joint Commission on

21

Accreditation of Hospitals and the hospitals' own by-laws could serve as sources of the standard of care applicable to the hiring of doctors); *Sapp v. W. T. Grant Co.*, 341 P.2d 826, 828 (Cal. Dist. Ct. App. 1959) (noting that internal operating rules of a railway company would be used as evidence bearing on the standard of care appropriate for truck crossings); *Bryan v. S. Pac. Co.*, 286 P.2d 761, 765 (Ariz. 1955) (noting that internal rules have probative value in establishing negligence, but that violation of internal rules would not constitute negligence per se). The Agreement is evidence of a standard the Hospital set for itself. But a failure to follow it may or may not be negligent when viewed in the context of the entire screening process actually undertaken.

**{78}** Second, consistent with the general concerns evident in all negligent hiring cases, *Feil* clearly contemplated review and consideration of the entire procedure used by hospitals to screen physicians. The basic inquiry in all negligent hiring cases is whether the employer knew or should have known of circumstances in the employee's background which create an unreasonable risk of injury to the persons with whom the employee could be reasonably expected to interact. *Spencer v. Health Force, Inc.*, 2005-NMSC-002, ¶ 10, 137 N.M. 64, 107 P.3d 504. Lack of board certification in emergency medicine would likely be relevant in a case involving an emergency room physician, but it could not properly be the sole inquiry if there is broader testimony about a doctor's experience and background which a hospital reviewed in evaluating a prospective physician for privileges. Applying Plaintiff's position literally here would lead to the anomalous result that the Hospital would have been negligent and liable if it had hired one of Plaintiff's own expert witnesses.

**{79}** Third, we fail to see how a lay person could have the special knowledge necessary to evaluate the weight and effect of Mr. Robinson's acceptance of Dr. Collins (even though he was not AMA or AOA board certified in emergency medicine) in view of all of the evidence noted above. We conclude that expert testimony was necessary to explain the credentialing process to jurors and establish the standard of care to be applied. In this case, that explanation would perforce address the Agreement with Chaves, placing it in the context of the entire range of evidence detailing what the Hospital and Mr. Robinson did know, and should have known, before offering Dr. Collins staff privileges. Without expert guidance, a lay person could not knowledgeably decide if Mr. Robinson's decision was negligent or not.

**{80}** Comparing our analysis to similar cases from other jurisdictions, we find we are in the mainstream. A recent American Law Report Annotation on the subject observed that "[a]ll courts that have looked at the question have concluded that expert testimony is necessary to establish the standard of care owed by a hospital, or whether the hospital has been negligent." Benjamin J. Vernia, Annotation, *Tort Claim for Negligent Credentialing of Physicians*, 98 ALR 5th 533, 553 (2002). Our own canvass of the law confirms the assertion. Without attempting to be encyclopedic, the following cases are a representative sample. *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997) (holding that, "unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff"); *Johnson v. Misericordia Cmty. Hosp.*, 301 N.W.2d 156, 172 (Wis. 1981) (holding that "since the procedures ordinarily employed by hospitals in

evaluating applications for staff privileges are not within the realm of the ordinary experience of mankind, we agree . . . that expert testimony was required to prove the same"); *Frigo v. Silver Cross Hosp. & Med. Ctr.*, 876 N.E.2d 697, 724 (Ill. App. Ct. 2007) (holding that expert testimony is required to prove the applicable standard of care concerning granting staff privileges and whether the standard was violated); *Neff v. Johnson Mem. Hosp.*, 889 A.2d 921, 928 (Conn. App. Ct. 2006) (holding that the "parameters of a hospital's judgment in credentialing its medical staff is not within the grasp of ordinary jurors. To the contrary, a hospital's decision whether to grant staff privileges to a physician is a specialized activity, executed by senior members of the hospital's staff, such as the chief executive officer and the department chief"); *Mills v. Angel*, 995 S.W.2d 262, 275 (Tex. App. 1995) (holding that "[e]xpert testimony *is required* to establish liability in the area of credentialing, because the procedures ordinarily used by a hospital in evaluating applications for staff privileges are not within the realm of the ordinary experience of jurors"); *Jordan v. Long Beach Cmty. Hosp.*, 248 Cal. Rptr. 651, 664 (Cal. Ct. App. 1988) (withdrawn from publication) (holding that "[w]here, as here, the question turns on where and whether the physician received a proper medical education, or his success rate on certain tests, expert testimony is required to assist the jury in making its determination as to the medical matters involved").

**{81}** Because Plaintiff did not present expert testimony to establish the standard of care under the circumstances of this case, we reverse the compensatory damages award based on the claim of negligent hiring. Without the compensatory award, there can be no award of punitive damages, and we therefore reverse the punitive damages award based on this claim as well.

## III.    THE UNFAIR PRACTICES CLAIM

**{82}** The jury found that the Hospital willfully engaged in unfair or deceptive trade practices and awarded $9,501.65 in damages. The claim was based on New Mexico's Unfair Practices Act. Sections 57-12-1 to -26. "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising." *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 22, 142 N.M. 437, 166 P.3d 1091. In addition, "[t]he UPA . . . imposes a duty to disclose material facts reasonably necessary to prevent any statements from being misleading." *Id.* ¶ 40 (second alteration in original) (internal quotation marks and citation omitted).

**{83}** The Hospital argues that the UPA claim should not have been submitted to the jury at all. This presents a question of law which we review de novo. *McNeill v. Burlington Res. Oil & Gas Co.*, 2008-NMSC-022, ¶ 36, 143 N.M. 740, 182 P.3d 121 (we review de novo the district court's decision on a motion for a directed verdict); *Sunwest Bank v. Garrett*, 113 N.M. 112, 115, 823 P.2d 912, 915 (1992) ("A directed verdict is appropriate only when there are no true issues of fact to be presented to a jury.").

**{84}** The Hospital makes two separate arguments: (1) an assertion—likely mislabeled—that the practice of medicine and the operation of hospitals are exempt from the UPA, and (2) that the advertising relied upon by Plaintiff was mere puffery and thus not actionable as a matter of law. We decline to address the second because it was not

23

preserved. *Woolwine v. Furr's Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987). The Hospital's argument below was that the materials Plaintiff relied on were too vague to be unlawful. Vagueness is distinct enough from the concept of puffery to require an argument based on its particular features. *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004) (mem. & order) ("Puffery is a somewhat amorphous concept . . . defined alternately as 'an exaggeration or overstatement expressed in broad, vague, and commendatory language' . . . and as an 'exaggerated, blustering, and boasting statement upon which no reasonable buyer would rely.'" (citation omitted)).

**{85}** The Hospital's first argument is more nuanced. Contrary to its general claim of exemption from the UPA, the Hospital concedes that "it is generally recognized that physicians and health care providers are subject to statutes prohibiting unfair trade practices." There is a limit to the reach of such statutes over health care and other professionals. The case law across the country holds that unfair practice statutes only apply to the entrepreneurial, commercial, or business aspect of a physician's practice, including advertising, solicitation of business, and billing practices. *Ikuno v. Yip*, 912 F.2d 306, 312 (9th Cir. 1990) (applying Washington law that consumer protection law can be applied to legal and medical professionals "when the actions at issue are chiefly concerned with 'entrepreneurial' aspects of practice"); *Darviris v. Petros*, 812 N.E.2d 1188, 1193 (Mass. 2004) (holding that violation of informed consent statute and medical negligence could not form basis for claim under consumer protection statute); *Quimby v. Fine*, 724 P.2d 403, 406 (Wash. Ct. App. 1986) (upholding denial of summary judgment requested by doctor and noting that medical negligence claims could not form basis of Consumer Protection Act claim, but that claim alleging lack of informed consent could be asserted under CPA depending on factual showing).

**{86}** *Quimby* is particularly instructive. The court there held that the claim under the consumer protection statutes premised on the same facts as the medical negligence claim could not go forward because it related to the actual competence of the medical practitioner defendant. The *Quimby* court distinguished the claims under the consumer protection statutes relating to problems of informed consent by noting that lack of informed consent is not limited to a breach of professional standards. "Instead, a lack of informed consent claim can be based on dishonest and unfair practices used to promote the entrepreneurial aspects of a doctor's practice, such as when the doctor promotes an operation or service to increase profits and the volume of patients, then fails to adequately advise the patient of risks or alternative procedures." *Id.* The inquiry thus hinges on whether the medical negligence and UPA claims are coterminous or indistinguishable; that is, whether they rely on the same facts and rely on a judgment as to the "actual competence of the medical practitioner" for resolution. *Id.* If they do, a UPA claim is not appropriate. If they do not, a UPA claim may be viable, depending of course on the facts.

**{87}** We review the district court's denial of a directed verdict by resolving conflicts in the evidence and including all reasonable interpretations of the evidence in favor of the party resisting the directed verdict. *Sunwest Bank*, 113 N.M. at 115, 823 P.2d at 915. Plaintiff's presentation focused on the Hospital's billboard and internet advertising, in particular its description of "[o]ur team of trained physicians, nurses and technicians" and the Hospital's

24

"ER+ goal" to provide 24-hours-a-day, seven-days-a-week access to "qualified physicians." Plaintiff argued that the impression left by these materials was that the Hospital was in charge of its emergency room. Plaintiff then contrasted that impression with the testimony from Dr. Collins that even though he was an independent contractor, no one could direct how he dealt with patients as to his treatment or clinical judgment. This testimony raises a sufficient question of fact about whether the Hospital's representations were misleading and whether it had an obligation to disclose facts—such as the status of the ER doctors—in order to allay the potential for misunderstanding. Resolution of the question whether the advertising materials were materially misleading does not rely on the actions of the medical personnel on the day Mr. Grassie died. Thus, the UPA issues are separate enough from the questions of the actual medical competence of the doctors and nurses to allow the UPA claims to proceed. We find no error in the district court's refusal to grant a directed verdict as to the UPA claims.

## IV.    DENIAL OF LEAVE TO FILE A THIRD-PARTY COMPLAINT

**{88}**    The Hospital argues that the district court abused its discretion in twice denying its motion for leave to file a third-party complaint against Chaves. We review such decisions under an abuse of discretion standard. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. To merit reversal of a discretionary ruling—in particular one dealing with the district court's management of its own docket—the ruling must be "clearly untenable or not justified by reason." *State v. Apodaca*, 118 N.M. 762, 770, 887 P.2d 756, 764 (1994) (internal quotation marks and citation omitted); *Kerman v. Swafford*, 101 N.M. 241, 245, 680 P.2d 622, 626 (Ct. App. 1984).

**{89}**    The Hospital filed its first motion on January 31, 2007, one month after Plaintiff filed his first amended complaint. The Hospital asserted that it wished "to protect its rights to indemnification and contribution" from Chaves. The Hospital later expanded its reasoning to include the potential for inconsistent results in any later separate litigation between it and Chaves.

**{90}**    The matter was not heard by the district court until April 2, 2007. During the argument it was noted that trial was then set for June 26, 2007. Trial was actually held in mid-July 2007. After a forty-eight minute argument in which counsel for both parties had a full opportunity to air their positions, the district court ruled as follows:

> The Court:    I'm going to deny the motion. Two bases: One is, at this stage in this litigation I think the joinder would cause a substantial delay in these proceedings. Second is that I can't imagine that the [H]ospital wasn't clearly aware that there was the issue of indemnity, the issue of the negligence of these physicians early on in these proceedings so that if they wanted to bring the Chaves Group into this suit, they could have done that in a timely way. Motion be denied.

25

**{91}** On appeal the Hospital does not reprise any of the arguments made below. Here, the Hospital asserts that the absence of Chaves in the courtroom allowed Plaintiff to make assertions and arguments about Chaves which "resulted in a verdict tainted by passion and prejudice."

**{92}** We discern no abuse of discretion in the district court's decision. The district court's concern about the trial schedule is reasonable. Further, we do not perceive that Chaves' absence from the courtroom caused any prejudice of any kind, much less reversible prejudice. As noted above, the evidence of aggravated medical negligence was strong. Our own detailed review of the trial assures us that the Hospital was able to and did respond to all of Plaintiff's assertions concerning Chaves. If the quality of the response fell short from the Hospital's standpoint, it seems likely it was the result of the Hospital's own litigation strategy at trial.

## V.    CONCLUSION

**{93}** We affirm the compensatory and punitive damages award flowing from Plaintiff's theory of medical negligence. We also affirm the award premised on the UPA. We reverse the compensatory and punitive damages award premised on Plaintiff's negligent hiring theory. We affirm the district court's denial of the Hospital's motion to join Chaves. Each party will bear their own costs on appeal.

**{94}    IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

**TIMOTHY L. GARCIA, Judge (specially concurring).**

**GARCIA, Judge (specially concurring).**

**{95}** I write to specially concur in this decision because of the need to amend UJI 13-1827. In addition, the factual circumstances in this case support a review and clarification of the Supreme Court's decision in *Clay*.

**{96}** In this case, the punitive damage instruction—instruction number twenty-six—failed to meet one of the specific elements in *Clay* that required the jury to find a culpable mental state on the part of the Hospital in order to award punitive damages. *Clay*, 118 N.M. at 269, 881 P.2d at 14 (recognizing that "[t]o be liable for punitive damages, a wrongdoer must have some culpable mental state, . . . and the wrongdoer's conduct must rise

26

to a willful, wanton, malicious, reckless, oppressive, or fraudulent level" (citations omitted)). It is undisputed that only one of these elements was included when UJI 13-1827 was modified and given to the jury. This Court agrees with the Hospital's argument that the proper language from *Clay* was excluded from punitive damage instruction number twenty-six. Despite the significance of this mistake, we have determined that the punitive damage instruction given in this case must stand due to the Hospital's failure to properly preserve its argument in the district court. The Hospital failed to propose proper language for instruction twenty-six and failed to make any specific argument regarding the accuracy of the proposed *Clay* instruction offered by Plaintiff. As a result of our determination regarding the preservation issue, it is important to reemphasize the defect in punitive damage jury instruction number twenty-six and seek guidance for our district courts. UJI 13-1827 has not been amended to address the cumulative conduct theory recognized in *Clay* for over seventeen years. It appears that an appropriate amendment to UJI 13-1827 is needed to avoid a reoccurrence of the jury instruction problem that arose in this case.

{97}    In addition, this case highlights a potential flaw in the application of the cumulative conduct theory where all but one of the alleged employee-tortfeasors was exonerated from liability for Plaintiff's injuries. In this case, the jury specifically found that the nurses' actions were not a cause of Mr. Grassie's injuries or death. As a result of this finding, Dr. Collins was determined to be the only alleged employee-tortfeasor who caused Mr. Grassie's injuries and death. Therefore, Plaintiff's recovery of compensatory damages was limited to the actions of Dr. Collins. *See Lewis v. Samson*, 2001-NMSC-035, ¶¶ 34-35, 131 N.M. 317, 35 P.3d 972 (explaining that in order to recover, a plaintiff still must establish that the second tortfeasor's negligence proximately caused some harm, even where damages are not apportionable). The significance of this jury finding in favor of the nurses is critical in this case because Plaintiff chose to abandon its claim of punitive damages arising under the theories of direct liability or vicarious liability. These additional theories of liability were excluded from instruction number twenty-six that was given to the jury. As a result, the actions of just one employee were the only legal basis for the recovery of actual compensatory damages, but the factual basis for a recovery of punitive damages was expanded to include the actions of additional employees, including the nurses, under the cumulative conduct theory.

{98}    Punitive damages have never been upheld in New Mexico under a cumulative conduct theory where liability was limited to the actions of a single employee-tortfeasor. *See Clay*, 118 N.M. at 271-72, 881 P.2d  at 16-17 (recognizing that the cumulative acts and failure of communication between two negligent employees, Candelaria and Schell, along with the cavalier attitude of their employer were a sufficient basis to establish the culpable mental state of the employer and impose punitive damages); *see also Chavarria*, 2006-NMSC-046, ¶¶ 21-34 (recognizing the applicability of the cumulative acts theory for the recovery of punitive damages resulting from the fraudulent actions of two employees, Pike and Lancaster, but ultimately addressing only the theories of managerial capacity and corporate ratification). In *Clay*, the Supreme Court also ratified the plaintiffs' position that allowed the jury to consider the employer's failure to file "Form 6" as evidence of a cavalier attitude toward safety. *Clay*, 118 N.M. at 272 n.4, 881 P.2d at 17 n.4. As a result, this additional evidence was used to help establish the employer's culpable mental state. *Id.*

**{99}** Based upon footnote 4 in *Clay*, we now recognize that the jury can properly consider the exonerated acts of the nurses as part of the Plaintiff's cumulative conduct theory for two purposes: (1) to expand the overall employee-tortfeasor actions to be considered in the punitive damages analysis to include more than just the acts of Dr. Collins; and (2) to allow the consideration of actions by exonerated employee-tortfeasors as further evidence of punitive damages and a culpable mental state of their employer. Although this determination could be considered an expanded application of *Clay*, it is also consistent with the broad language used by the Supreme Court when it adopted the cumulative conduct approach set forth in *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382 (Ky. 1985). *Clay*, 118 N.M. at 270-71, 881 P.2d at 15-16 (concluding that "[t]he culpable mental state of the corporation . . . may be inferred from the very fact that one employee could be ignorant of the acts or omissions of other employees with potentially disastrous consequences"). If the exonerated actions of the Hospital's nurses should be ignored for the purposes of determining punitive damages under the cumulative conduct theory, the Supreme Court needs to clarify the broad language utilized in *Clay*. *See Aguilera v. Palm Harbor Homes, Inc.*, 2002-NMSC-029, ¶ 6, 132 N.M. 715, 54 P.3d 993 (explaining that the Court of Appeals is bound by Supreme Court precedent).

**{100}** Therefore, I specially concur herein and suggest that the Supreme Court address UJI 13-1827 and add the necessary language to directly deal with the cumulative conduct theory established in *Clay*. In addition, I suggest that the Supreme Court clarify the application of its *Clay* decision under the factual circumstance where the jury limits the causation for a plaintiff's injuries and compensatory liability to the actions of a single employee-tortfeasor.

---

**TIMOTHY L. GARCIA, Judge**


**Topic Index for *Grassie v. Roswell Hosp. Corp.*, Docket No. 28,050**

| | |
|---|---|
| **PC** | **CIVIL PROCEDURE** |
| CP- TA | Third-party Actions |
| | |
| **CM** | **COMMERCIAL LAW** |
| CM-UP | Unfair Practices Act |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| | |
| **EV** | **EVIDENCE** |
| EV-EW | Expert Witness |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CI | Civil Jury Instructions |
| JI-IJ | Improper Jury Instructions |
| JI-MS | Modification of Jury Instructions |

**NG**           **NEGLIGENCE**
NG-NH          Negligent Hiring
NG-PC          Proximate Cause
NG-RS          Respondeat Superior
NG-SC          Standard of Care
NG-WG          Wrongful Death

**RE**           **REMEDIES**
RE-CD          Compensatory Damages
RE-EX          Excessive Damages
RE-PU          Punitive Damages

**TR**           **TORTS**
TR-MM          Medical Malpractice
TR-NH          Negligent Hiring
TR-PC          Proximate Cause