**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2020-NMCA-036

Filing Date: April 21, 2020

No. A-1-CA-37135

JACK WILLIS REYNOLDS AND
MARY LOUISE REYNOLDS
REVOCABLE TRUST AGREEMENT,

 Plaintiff-Appellee,

v.

STEPHEN D. LANDAU,

 Defendant-Appellant,

and

DOUG BISHOP and B.E.I. INC.,

 Defendants.

APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY
Robert A. Aragon, District Judge

Released for Publication August 11, 2020.

Mason & Isaacson, P.A.
Patrick T. Mason
Gallup, NM

for Appellee

Stephen D. Landau
Santa Fe, NM

Pro Se Appellant

**OPINION**

**MEDINA, Judge.**

**{1}** This case arises out of an action to foreclose on a mortgage that predated the purchase of the property by a third party in a tax deed sale. The purchaser of the property, Stephen Landau, appeals the district court's judgment on the merits and order for foreclosure sale in favor of the mortgagee, the Jack Willis Reynolds and Mary Louise Reynolds Revocable Trust Agreement (the Trust). Landau, appealing pro se, raises the following issues: (1) the Trust should not be able to foreclose on a mortgage ten years after the mortgagor had its corporate status administratively cancelled; (2) the Trust's foreclosure action was barred by the statute of limitations; (3) the Trust's agreement to extend the mortgage and corresponding promissory note discharged the mortgagor's debt; (4) the district court's findings were not supported by substantial evidence; (5) the district court abused its discretion in setting trial less than a month after the close of discovery, as well as striking Landau's motion for summary judgment as untimely; (6) the district court erroneously based its judgment on issues of equity relating to the rental income Landau made off of the property; and (7) cumulative error deprived Landau of a fair trial. We affirm.

## BACKGROUND

**{2}** On June 7, 2007, B.E.I., Inc. (BEI), a business corporation wholly owned and controlled by Doug Bishop,[1] executed a promissory note (the Note) in the principal sum of $115,000 made payable to the Trust. The Note required monthly payments of $1,200, with the remaining balance of $71,800 plus interest due on June 25, 2010. On June 25, 2007, BEI executed a mortgage (the Mortgage) on a parcel of land (the Property) it owned in McKinley County in favor of the Trust to secure the Note—including any extensions of the Note. The Note and the Mortgage were recorded together in the McKinley County Clerk's Office on June 28, 2007.

**{3}** Approximately one year before BEI executed the Note and Mortgage, the Office of the Public Regulation Commission (the Commission) sent BEI a notice informing it of its failure to file its annual corporate report required by the Corporate Reports Act, NMSA 1978, §§ 53-5-1 to -9 (1959, as amended through 2018). On July 21, 2007—approximately one month after BEI executed the Note and Mortgage—the Commission cancelled BEI's certificate of incorporation for failure to file the required corporate reports.[2] *See* § 53-5-7(A) (providing, in relevant part, that a corporation "shall have its certificate of incorporation canceled" for failure to file annual corporate report within sixty days of receiving notice that report is past due).

**{4}** On March 3, 2008, Bishop executed a personal guaranty to further secure BEI's obligations under the Note and Mortgage. Bishop made some payments on the Note but failed to pay off the remaining balance before the Note matured on June 25, 2010.

---

1Although the record is silent as to who owned BEI, the parties do not dispute that Bishop was BEI's sole shareholder.

2BEI never applied for reinstatement of its corporate status. *See* NMSA 1978, § 53-11-12(B) (2003) (providing that a "corporation administratively revoked" for failure to file corporate reports required pursuant to Section 53-5-2 may apply for reinstatement within two years of revocation).

Bishop also failed to pay the property taxes on the Property, resulting in the attachment of a tax lien on January 1, 2011.

{5}     On March 3, 2011, the Trust sent Bishop a letter (the First Extension Letter) stating, "Pursuant to our several telecons, by copy of this letter I am informing [the escrow agent hired to collect payments due under the Note] to extend our Promissory Note [and] Mortgage to October 25, 2011." On August 20, 2011, the Trust sent Bishop a second letter (the Second Extension Letter) stating, "Pursuant to our telephone conversation on August 17, 2011[,] we agreed to again extend our Promissory Note [and] Mortgage to October 25, 2012." Unlike the First Extension Letter, Bishop signed the Second Extension Letter, indicating his agreement to the extension.

{6}     Bishop continued to make sporadic payments after agreeing to the extension but did not pay off the remaining balance of the Note, which had accrued to approximately $90,000 by 2016. On July 22, 2016, the New Mexico Department of Taxation and Revenue (the Department) sold the Property for approximately $6,000 at public auction to Landau—a third party. Following the sale, the Department delivered to Landau a deed to the Property "convey[ing] . . . all of the former property owner's interest in the . . . [P]roperty . . .as of the date the [S]tate's lien for real property taxes arose . . . subject only to perfected interests in the real property existing before the date the property tax lien arose[.]"

{7}     On August 18, 2016, Landau succeeded in a quiet title action against BEI and Bishop. The Trust filed the instant action on March 13, 2017 against BEI, Bishop, and Landau, seeking to collect the remaining balance of the Note and to foreclose on the Mortgage. Only Landau, acting pro se,[3] responded to the suit. The district court held a Rule 1-016 NMRA scheduling conference on August 29, 2017, and scheduled a bench trial for November 8, 2017. The court also initially set the discovery deadline for October 1, 2017, but extended the deadline to October 15 upon Landau's request. The court did not set any other deadlines or enter a scheduling order.

{8}     Landau filed a motion for summary judgment on November 3, 2017, arguing the Trust could not foreclose on the Mortgage because: (1) BEI's corporate status was cancelled almost ten years prior to the suit, and thus the survival period to bring suit against the corporation had expired; (2) Bishop discharged BEI's debt by agreeing to the extensions on behalf of himself personally; and (3) the six-year statute of limitations for foreclosing on the Mortgage had run and the extension letters were insufficient to revive the limitations period because neither was notarized or recorded, as required by NMSA 1978, Section 37-1-16 (1957).

{9}     The Trust moved to strike Landau's motion as untimely. On November 8, 2017, the district court granted the Trust's motion to strike, and the case proceeded to trial as scheduled. The only witnesses to testify were Landau and Brad Reynolds, the

---

3Other than retaining counsel to represent him at trial, Landau was pro se throughout the case.

successor trustee to the Trust, neither of whom had any first-hand knowledge of the Trust's dealings with BEI and Bishop.

**{10}** The district court ruled from the bench in the Trust's favor "as a matter of law and equity," ordered foreclosure and sale of the Property, and asked the Trust to prepare an order reflecting the court's judgment. On November 17, 2017, Landau filed a request for findings of fact and conclusions of law pursuant to Rule 1-052 NMRA, which included his proposed findings and conclusions. The district court did not rule on Landau's request but approved the form of order submitted by the Trust three days later, which included findings of fact and conclusions of law.[4] The court's findings and conclusions did not include any of the ones submitted by Landau. On November 20, 2017, the district court as relevant to this appeal, concluded that the Trust was not barred from suing BEI for foreclosure because New Mexico's survival statute for business corporations, NMSA 1978, § 53-16-24 (1967), did not contain an express time limit for filing suit against a dissolved corporation.

**{11}** The court further concluded that the Trust's foreclosure action was timely because: (1) Bishop and BEI entered into a "valid agreement in writing to defer the payment of the full amount due under the Mortgage and Note to October 25, 2012, thus tolling the statute of limitations[, pursuant to NMSA 1978, Section 37-1-3(A) (2015);]" and (2) the continued payments on the Note revived the statute of limitations pursuant to Section 37-1-16. The court ordered the Mortgage foreclosed and appointed a special master to conduct a foreclosure sale of the Property to pay off the remaining balance of the Note, reserving jurisdiction to render a deficiency judgment against Bishop and BEI. The court denied Landau's motion to reconsider, **[2 RP 274]** and this appeal followed.

## DISCUSSION

**{12}** Before we address Landau's arguments, a brief background on the tax deed sale process is useful. New Mexico's Property Tax Code (the Code) provides that, with certain exceptions not applicable to this case, "taxes on real property are a lien against the real property from January 1 of the tax year for which the taxes are imposed . . . [and] . . . continues until the taxes and any penalty and interest are paid." NMSA 1978, § 7-38-48 (2003). The Department may seize and sell real property to satisfy a tax delinquency on the property three years following the date the taxes first became delinquent. *See* NMSA 1978, § 7-38-65(A) (2013). In order to do this, the Department must first satisfy certain notice requirements and list the property at a public auction. *See* NMSA 1978, § 7-38-66 (2018) (identifying notice requirements); NMSA 1978, § 7-38-67(C) (2005) (requiring property to be sold at a public auction).

**{13}** Prior to the auction, the Department must set a minimum purchase price, which it determines by considering "the value of the property owner's interest in the real

---

4 It does not appear the Trust submitted any separate proposed findings of fact and conclusions of law, only the final form of order. The Trust does not dispute Landau's assertion that the district court's findings and conclusions are identical to the findings of fact and conclusions of law included in the Trust's final form of order, we therefore assume the court adopted the findings and conclusions verbatim.

property, the amount of all delinquent taxes, penalties and interest for which it is being sold and the costs." Section 7-38-67(E). Often times, the minimum purchase price is set significantly below the property's fair market value. *See, e.g.*, *Cochrell v. Mitchell*, 2003-NMCA-094, ¶¶ 3, 5, 134 N.M. 180, 75 P.3d 396 (setting minimum bid at $4,000 on property worth between $100,000 and $144,000); *see also Valenzuela v. Snyder*, 2014-NMCA-061, ¶ 17, 326 P.3d 1120 (setting minimum bid at $215 on property worth $25,000). One of the reasons for this is that "the purchaser at the tax sale buys, knowing the uncertainty of the title which is reflected in the purchaser's offer." *Valenzuela*, 2014-NMCA-061, ¶ 23 (alterations, internal quotation marks, and citation omitted).

**{14}** Once a property is purchased at auction, and the purchaser timely pays the amount due, the Department shall execute and deliver a deed to the purchaser. NMSA 1978, § 7-38-70(A) (1982). Historically, the sale of real property to satisfy a tax lien in New Mexico was said to provide a "paramount title cutting off all prior liens, [e]ncumbrances and interests of every character." *Alamogordo Improvement Co. v. Hennessee*, 1936-NMSC-018, ¶ 6, 40 N.M. 162, 56 P.2d 1127. However, the Code now provides:

> If the real property was sold substantially in accordance with the . . . Code, the deed [delivered to the tax deed sale purchaser] conveys all of the former property owner's interest in the real property as of the date the state's lien for real property taxes arose . . . , *subject only to perfected interests in the real property existing before the date the property tax lien arose.*

Section 7-38-70(B) (emphasis added).

**{15}** As relevant to this case, a mortgage constitutes an interest in real property and may be perfected by filing it for record "in the office of the county clerk of the county or counties in which the real estate affected thereby is situated." NMSA 1978, § 14-9-1 (1991); *see* NMSA 1978, § 14-9-2 (1886-87) (providing that recorded instruments "shall be notice to all the world of the existence and contents of the instruments"); *Connelly v. Wertz*, 1993-NMCA-090, ¶ 15, 115 N.M. 803, 858 P.2d 1282 ("An instrument such as a deed or mortgage is said to become perfect or perfected when recorded (or registered) or filed for record, because it then becomes good as to all the world." (internal quotation marks and citation omitted)), *overruled on other grounds by Sw. Land Inv., Inc. v. Hubbart*, 1993-NMSC-072, ¶ 7, 116 N.M. 742, 867 P.2d 412.

**{16}** Because perfected mortgages are discoverable by a search of the county clerk's records, it is incumbent on tax deed buyers to perform a title search and diligently investigate the existence and status of any such mortgage prior to purchasing the property. *See F & S Co. v. Gentry*, 1985-NMSC-065, ¶ 8, 103 N.M. 54, 702 P.2d 999 (stating that "[a]nything discoverable from a reasonably prudent search of . . . records [maintained by the county clerk] would serve as constructive notice"); *see also Camino Real Enters., Inc. v. Ortega*, 1988-NMSC-061, ¶ 3, 107 N.M. 387, 758 P.2d 801

("[W]here the facts brought to the knowledge of the intending purchaser are such that in the exercise of ordinary care he ought to inquire, but does not, and his failure to do so amounts to gross or culpable negligence, he will be charged with a knowledge of all the facts which the inquiry, pursued with reasonable diligence, would have revealed." (internal quotation marks and citation omitted)).

**{17}** Although Landau claims he did not have actual knowledge of the Mortgage at the time he purchased the Property in the tax deed sale, he does not dispute that the Mortgage was properly recorded in accordance with Section 14-9-1 before the property tax lien arose. Thus, the underlying question of whether Landau's interest in the Property he received from the tax deed sale was subject to the Mortgage does not appear to be in dispute, only the Trust's ability to foreclose on the Mortgage. With this in mind, we proceed to address Landau's arguments.

### Standard of Review

**{18}** Landau raises both factual and legal questions. Challenges to a district court's factual findings will not be disturbed on appeal so long as they are supported by substantial evidence. *Segal v. Goodman*, 1993-NMSC-018, ¶ 15, 115 N.M. 349, 851 P.2d 471. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Robey v. Parnell*, 2017-NMCA-038, ¶ 10, 392 P.3d 642 (internal quotation marks and citation omitted). "In reviewing a claim of insufficient evidence, we resolve all disputes of facts in favor of the successful party and indulge all reasonable inferences in support of the prevailing party." *Id.* (alteration, internal quotation marks, and citation omitted). "[T]his court will not reweigh the evidence nor substitute our judgment for that of the fact-finder." *Id.* (alteration, internal quotation marks, and citation omitted). While this standard is generally deferential, we may relax our usual deference when the district court adopts verbatim the prevailing party's extensive requested findings and conclusions. *See Los Vigiles Land Grant v. Rebar Haygood Ranch, LLC*, 2014-NMCA-017, ¶ 2, 317 P.3d 842.

**{19}** We review de novo challenges to a district court's conclusions of law. *Robey*, 2017-NMCA-038, ¶ 11. To the extent addressing these issues requires us to engage in statutory interpretation, "our charge is to determine and give effect to the Legislature's intent." *Little v. Jacobs*, 2014-NMCA-105, ¶ 7, 336 P.3d 398 (internal quotation marks and citation omitted). In order to do this, we look first to the plain language of the statute. *See Cook v. Anding*, 2008-NMSC-035, ¶ 7, 144 N.M. 400, 188 P.3d 1151. "[W]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Bank of New York v. Romero*, 2014-NMSC-007, ¶ 40, 320 P.3d 1 (internal quotation marks and citation omitted). This Court "will not read into a statute language which is not there, particularly if it makes sense as written." *State ex rel. Duran v. Anaya*, 1985-NMSC-044, ¶ 10, 102 N.M. 609, 698 P.2d 882.

### I.     BEI's Administrative Cancellation Does Not Bar the Trust's Suit

**{20}** Landau argues the Trust should be barred from foreclosing on the Mortgage because BEI had its corporate status administratively cancelled almost ten years before the Trust brought suit. "At common law, a corporation ceased to exist on the date it was dissolved, and all actions pending against it abated." *Quintana v. Los Alamos Med. Ctr., Inc.*, 1994-NMCA-162, ¶ 5, 119 N.M. 312, 889 P.2d 1234. In order to ameliorate the harsh results of the rule on those who sought to bring suit against dissolved corporations, New Mexico, like other states, enacted a corporate survival statute to extend the period for settling claims against a dissolved corporation. *See Smith v. Halliburton Co.*, 1994-NMCA-055, ¶ 12, 118 N.M. 179, 879 P.2d 1198 ("In order to ease that harsh effect [of the common law rule], a number of states have enacted corporate survival statutes to extend the period for settling claims against a dissolved corporation."); *see also Quintana*, 1994-NMCA-162, ¶ 6 (noting that all states have adopted survival statutes). "Once the survival period has ended, the corporation ceases to exist and can no longer be sued." *Quintana*, 1994-NMCA-162, ¶ 6. New Mexico's survival statute applicable to business corporations provides:

> The dissolution of a corporation does not take away or impair any remedy available to or against the corporation, its directors, officers or shareholders, for any right or claim existing, or any liability incurred, prior to the dissolution and any such action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name. The shareholders, directors and officers may take such corporate or other action as appropriate to protect the remedy, right or claim.

Section 53-16-24.

**{21}** In this case, we note that BEI's certificate of incorporation was administratively "cancelled" pursuant to Section 53-5-7, rather than voluntarily or involuntarily "dissolved," pursuant to NMSA 1978, Sections 53-16-1 to -3, -13 (1967, as amended through 2003). Because the parties do not dispute that these terms have any meaningful difference, and because the Legislature has not enacted a separate survival statute for administratively cancelled corporations, we treat BEI's administrative cancellation as having the same effect as a dissolution for purposes of our discussion. *See* § 53-5-7.1 ("A domestic corporation whose certificate of incorporation has been canceled . . . pursuant to Section 53-5-7 . . . shall be stricken from the files of the [C]ommission . . . without further proceedings."); G. Van Ingen, Annotation, *Power of Corporation After Expiration or Forfeiture of its Charter; Effects of Dissolution*, 97 A.L.R. 477 (1935) ("The dissolution of a corporation is the termination of its corporate existence in any manner, whether by the expiration of its charter, a decree of the court, an act of the legislature, a governmental decree, or the voluntary act of its members.").

**{22}** Although Landau recognizes that Section 53-16-24 does not contain an express time limit on the survival of remedies against dissolved business corporations, he contends this Court should establish such a limit. In support of this argument, Landau points out that the majority of states have adopted an express time limit on the survival

of remedies against dissolved corporations. *See Smith*, 1994-NMCA-055, ¶ 12 (noting that the majority of survival statutes specify a time in which a suit can be brought against a dissolved corporation). Landau also points out that New Mexico provides express survival periods for non-profit corporations, limited liability companies, and limited partnerships. *See* NMSA 1978, § 53-8-63 (1975) (providing a two-year survival period for non-profit corporations), NMSA 1978, § 53-19-46(C) (1995) (providing a three-year survival period for limited liability companies), NMSA 1978, § 54-2A-807(C) (2007) (providing a five-year survival period for limited partnerships).

**{23}** Landau's reliance on these authorities is misplaced. First, Landau cannot point to a single state that has judicially enacted a survival period—as Landau now requests from this Court. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that when a party fails to cite authority for an argument, we may assume none exists). Second, that our Legislature has enacted express survival periods for other legal entities but not business corporations cuts against Landau's argument. "When there are provisions in analogous statutes that a party contends should be present in the statute at issue in the case, we utilize the process of negative inference to reason that the absence of such provisions in the statute at issue is intentional." *State v. Lucero*, 1992-NMCA-103, ¶ 6, 114 N.M. 460, 840 P.2d 607. Hence, these enactments demonstrate that the Legislature knows how to create an express survival period for business corporations if it intends to do so, and through negative inference we assume the absence of an express survival period in Section 53-16-24 is intentional. *Cf. Patterson v. Globe Am. Cas. Co.*, 1984-NMCA-076, ¶ 10, 101 N.M. 541, 685 P.2d 396 (observing that the defendant's citation to other statutes providing a private right of action demonstrates, by negative inference, that the lack of a provision for a private action under the Unfair Insurance Practices Act was intentional), *recognized on other grounds as stated in Starko, Inc. v. Presbyterian Health Plan, Inc.*, 2012-NMCA-053, 276 P.3d 252.

**{24}** Though Landau may debate the merits of the Legislature's decision not to provide a limitation period in Section 53-16-24, our role is to construe statutes as written, not to second-guess the Legislature's policy decisions. *See State v. Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933 ("We adhere to the principle that a statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration." (alteration, internal quotation marks, and citation omitted)). Accordingly, we decline to read into Section 53-16-24 a limitation period. Because BEI executed the Note and Mortgage prior to its administrative cancellation, the Trust is not barred from foreclosing on the Mortgage. *See* § 53-16-24.

**{25}** Landau alternatively argues that allowing the Trust to foreclose on the Property would be inequitable because BEI had a duty to liquidate its assets and wind up its affairs after having its corporate status cancelled, and Bishop should not be permitted to "benefit from the corporate veil of his long-ago dissolved corporation[] and avoid[] judgment personally for . . . failing in his obligation to the Trust." However, Landau

provides no authority for the proposition that the district court could invoke its equitable jurisdiction to prevent the foreclosure in light of Section 53-16-24's indefinite survival period. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2 (stating that when a party fails to cite authority for an argument, we may assume none exists); *Gzaskow v. Pub. Emps. Ret. Bd.*, 2017-NMCA-064, ¶ 39, 403 P.3d 694 ("That a court may not exercise an equitable remedy to accomplish a goal that a statute has foreclosed is well recognized by courts throughout the United States.").

**{26}**     Moreover, even if the district court could exercise its equitable jurisdiction in the manner Landau requests, his argument rests on the faulty premise that Bishop avoided the consequences of his actions. To the contrary, Bishop—apparently BEI's sole shareholder—was the de facto owner of the Property being foreclosed upon. *See McCauley v. Tom McCauley & Son, Inc.*, 1986-NMCA-065, ¶ 48, 104 N.M. 523, 724 P.2d 232 ("It is fundamental, of course, that the corporation has a personality distinct from that of its shareholders, and that the latter neither own the corporate property nor the corporate earnings. The shareholder simply has an expectancy in each, and he becomes the owner of a portion of each only when the corporation is liquidated[.]" (internal quotation marks and citation omitted)). Additionally, the district court found Bishop personally liable for any deficiency owed to the Trust should the Property sale not cover the amounts owing under the Note. We therefore decline to further consider this argument.

## II.     The Extension Letters Tolled the Statute of Limitations

**{27}**     Landau argues that the Trust was barred by the statute of limitations from foreclosing on the Mortgage because the Trust failed to revive the statutory period pursuant to Section 37-1-16. The limitations period applicable to actions founded upon contractual obligations contained in promissory notes (such as the foreclosure action in this case) is six years. *See* § 37-1-3(A). Generally, the limitations period begins to run on the promissory note's maturity date. *See Joslin v. Gregory*, 2003-NMCA-133, ¶ 9, 134 N.M. 527, 80 P.3d 464 (observing that the statute of limitations normally begins to run for the entire balance of a promissory note on the date of maturity). However, the limitations period for promissory notes requiring installment payments begins to run only with respect to each installment when due. *See LSF9 Master Participation Tr. v. Sanchez*, 2019-NMCA-055, ¶¶ 12-13, 450 P.3d 413 (construing a note promising periodic payments as an installment contract and holding that the statute of limitations began to run with respect to each installment when due).

**{28}**     In this case, the statute of limitations began to run with respect to each monthly installment when due and with respect to the remaining balance of the Note on June 25, 2010, the date the Note matured. Thus, the Trust had until June 25, 2016, at the latest, to bring an action to foreclose on the Mortgage in satisfaction of the Note's debt unless the limitations period was tolled or revived. *See* § 31-1-3(A). The district court held that the statute of limitations was both tolled and revived, concluding: (1) the extension letters tolled the statute of limitations pursuant to Section 37-1-3(A) and (2) the

continued payments on the Note revived the statute of limitations pursuant to Section 37-1-16.

**{29}** Because we agree that the extension letters tolled the statute of limitations under Section 37-1-3(A) long enough for the Trust to bring this foreclosure action within the six-year limitations period, we need not address whether the payments also revived the statute of limitations under Section 37-1-16. *See In re Estates of Brown v. Dickinson*, 2000-NMCA-030, ¶ 18, 128 N.M. 825, 999 P.2d 1057 ("We may affirm the district court on an alternate ground where it has reached the correct result and where reliance on an alternate ground would not be unfair to the appellant."). We explain. Section 37-1-3(A) provides, in relevant part:

> If the payee of any . . . promissory note . . . enters into any contract or agreement in writing to defer the payment thereof, or contracts or agrees not to assert any claim against the payor or against the assets of the payor until the happening of some contingency, the time during the period from the execution of the contract or agreement and the happening of the contingency shall not be included in computing the six-year period of limitation[.]

Hence, "the time elapsing between the making of the contract [made pursuant to Section 37-1-3(A)] and the happening of the condition when performance became due should not be counted [when calculating the six-year limitation period]." *Harp v. Gourley*, 1961-NMSC-026, ¶ 29, 68 N.M. 162, 359 P.2d 942.

**{30}** In this case, the Trust sent Bishop two extension letters: the First Extension Letter on March 3, 2011, extending the Note and Mortgage to October 25, 2011, and the Second Extension Letter on August 20, 2011, extending the Note and Mortgage to October 25, 2012. These letters were sufficient to toll the statute of limitations for collecting on the Note and foreclosing on the Mortgage because they constituted an "agreement in writing to defer the payment" on the Note and Mortgage.[5] Section 37-1-3(A). Thus, the time between March 3, 2011 (the date of the First Extension Letter) and October 25, 2012 (the date to which the Second Extension Letter extended the Note and Mortgage)—one year, seven months, and twenty-two days—should not be included in computing the six-year limitation period. *Id.* Subtracting this period from the period between the Note's original maturity date and the date the Trust filed its foreclosure

---

5Landau summarily argues that the extension letters did not "defer the payment of the debt" because they only extended the Note's maturity date and provided that "regular payments must continue to be made according to the original terms of the Note." As Landau does not develop an argument as to how an extension of the Note's maturity date does not "defer the payment of the debt," we decline to address this contention. *See Titus v. City of Albuquerque*, 2011-NMCA-038, ¶ 30, 149 N.M. 556, 252 P.3d 780 ("This Court has no duty to review an argument that is not adequately developed."); *Date, Black's Law Dictionary* (11th ed. 2019) (defining "maturity date" as "[t]he date when a debt falls due, such as a debt on a promissory note or bond").

action—six years, eight months, and sixteen days would bring the Trust's action within the six-year limitations period.[6]

**{31}** Landau's argument focuses on the district court's conclusion that Bishop and BEI's continued payments on the Note and Mortgage revived the statute of limitations pursuant to Section 37-1-16, which provides:

> Causes of action founded upon contract shall be revived by the making of any partial or installment payment thereon or by an admission that the debt is unpaid, as well as by a new promise to pay the same; but such admission or new promise must be in writing, signed by the party to be charged therewith. . . . *Provided, that no admission that the debt is unpaid or new promise to pay the same shall be effective to extend the lien of any mortgage upon real estate or any interest therein given to secure the original indebtedness, unless the payment is accompanied by an admission or promise and unless such admission that the debt is unpaid or new promise to pay the same, signed by the party to be charged therewith and acknowledged by such party in the form prescribed by law for the acknowledgments of instruments affecting real estate, shall be filed for record in the office of the county clerk where said original mortgage is of record, prior to the date when any action to foreclose said mortgage lien would otherwise be barred under existing law*[.]

(Emphasis added.) In light of the emphasized language, Landau argues that the statute of limitations for foreclosing on the Mortgage was not revived because Bishop did not sign the First Extension Letter and the Trust failed to have the Second Extension Letter notarized and recorded.[7] Thus, Landau argues, any action to foreclose on the Mortgage was untimely.

**{32}** Landau's reliance on Section 37-1-16 is misplaced. Even if the payments were insufficient to revive the statute of limitations for foreclosing on the Mortgage without a notarized and recorded agreement in accordance with Section 37-1-16, the extension letters satisfied Section 37-1-3(A)'s tolling provision, bringing the action within the applicable limitations period. As it was not necessary for the extension letters to meet the requirements of the revival statute, any examination of this issue would be an exercise of futility. *See Sheraden v. Black*, 1988-NMCA-016, ¶ 10, 107 N.M. 76, 752

---

6We note that, even taking the tolled period into account, some of the uncollected monthly payments due prior to the Note's original maturity date may have been barred by the statute of limitations. *See LSF9 Master Participation Tr.*, 2019-NMCA-055, ¶¶ 12-13 (holding that the statute of limitations began to run with respect to each installment when due). However, it is unclear what payments Bishop made before the Note's original maturity date. Given the unclear record, and given that Landau does not raise this issue on appeal, we decline to address this issue. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

7Landau also argues that the extensions were insufficient to revive the statute of limitations for foreclosing on the Mortgage because Bishop signed the Second Extension Letter on behalf of himself personally, and not on behalf of BEI—the mortgagor. As we discuss later, there was substantial evidence that Bishop agreed to the extensions on behalf of BEI.

P.2d 791 ("It is well settled in New Mexico that the function of a reviewing court on appeal is to correct erroneous results, not to correct errors that, even if corrected, would not change the result."). We therefore hold that the Trust was not barred by the statute of limitations from foreclosing on the Mortgage.

### III. The Trust's Mortgage Was Not Discharged by the Extension Letters

**{33}** Landau argues that Bishop's agreement to extend the Note and Mortgage discharged BEI's debt and extinguished the Mortgage. In support of this argument, Landau cites *Farmington Nat'l Bank v. Basin Plastics, Inc.*, 1980-NMSC-092, ¶ 7, 94 N.M. 668, 615 P.2d 985, in which our Supreme Court observed, "It has been held that an agreement between a payee and maker of a note to extend the time of payment of the note discharges any co-maker who has not consented to the extension." Landau's argument rests on the assumption that Bishop agreed to the extensions on behalf of himself and not BEI. However, as we discuss below, there is substantial evidence that Bishop entered into the extension agreement on behalf of BEI. Accordingly, Landau's argument fails.

### IV. Substantial Evidence Supports All Material Findings of Fact

**{34}** Plaintiff challenges several of the district court's findings of fact, claiming that they are not supported by substantial evidence. We address each challenge in turn.

### A. Verbatim Adoption of the Trust's Findings and Conclusions

**{35}** Landau contends that the district court abdicated its judicial responsibility by adopting all of the Trust's findings and conclusions included in its final form of order. He argues that we should remand for the district court to enter its own findings and conclusions. We agree "the [district] court is required to exercise independent judgment in arriving at its decision and should generally avoid verbatim adoption of all of the findings and conclusions submitted by a party." *Pollock v. Ramirez*, 1994-NMCA-011, ¶ 28, 117 N.M. 187, 870 P.2d 149. "This practice can all too often result in unsupported, ambiguous, inconsistent, overreaching, or unnecessary findings and conclusions." *Los Vigiles Land Grant*, 2014-NMCA-017, ¶ 2. For this reason, we caution the district court to avoid the wholesale verbatim adoption of the prevailing party's proposed findings and conclusions, as was done in this case.

**{36}** Nonetheless, a district court's verbatim adoption of proposed findings is not error so long as the findings are supported by substantial evidence. *See Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2018-NMSC-025, ¶ 40, 417 P.3d 369. As we discuss below, substantial evidence supports the findings of fact material to this appeal. Consequently, we decline to remand to the district court.

### B. Bishop Agreed to Extend the Note and Mortgage on Behalf of BEI

**{37}** Landau challenges the district court's finding that the Trust granted two extensions of the Note and Mortgage to BEI, which the court concluded constituted "a valid agreement in writing to defer the payment of the full amount due under the Mortgage and Note to October 25, 2012, thus tolling the statute of limitations." Specifically, Landau argues that the extension letters were insufficient to toll the statute of limitations for foreclosing on the Mortgage because BEI—the mortgagor and record holder of title to the Property—did not agree to the extension. Rather, Landau claims Bishop agreed to the extension on behalf of himself personally because both extension letters were addressed to Bishop without mentioning BEI, and the Second Extension Letter was signed by Bishop without any notation that he was signing on behalf of BEI.

**{38}** In support of his argument, Landau cites NMSA 1978, Section 55-3-402(b)(1) (1992), which provides, "If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument." That a representative may be personally liable on an instrument such as a promissory note when the form of the signature is ambiguous does not necessarily mean that the form of the signature must be clear in order to bind the person or entity being represented. Indeed, Section 55-3-402(a) provides:

> If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person *or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract*. If the represented person is bound, the signature of the representative is the "authorized signature of the represented person" *and the represented person is liable on the instrument, whether or not identified in the instrument*.

(Emphases added.); *see also* § 55-3-402 cmt. 1 ("Subsection (a) states when the represented person is bound on an instrument if the instrument is signed by a representative. If under the law of agency the represented person would be bound by the act of the representative in signing either the name of the represented person or that of the representative, the signature is the authorized signature of the represented person."). Thus, Landau's reliance on Section 55-3-402(b) is misplaced.

**{39}** While neither letter was explicitly directed to Bishop in his capacity as a representative for BEI, and Bishop did not indicate the capacity in which he signed the Second Extension Letter, we conclude there was sufficient evidence that Bishop agreed to the extension on behalf of BEI. First, both letters mention BEI in the reference line indicating the escrow account the Trust set up to receive payments on the Note and Mortgage. Moreover, the Second Extension Letter that Bishop signed stated, "Pursuant to our telephone conversation on August 17th, 2011[,] we agreed again [to] extend *our Promissory Note and Mortgage* to October 25, 2012." It is reasonable to infer that both Bishop and the Trust understood Bishop could only extend the Mortgage if he did so on

behalf of BEI.[8] In light of the foregoing, we conclude there was substantial evidence that Bishop agreed to extend the Note and Mortgage to October 25, 2012, on behalf of BEI.

## C.    The Note and Mortgage Were Not Void Ab Initio

**{40}**    Next, Landau argues that the Note and the Mortgage—which were both signed by Bishop on behalf of BEI—were void ab initio because there was insufficient evidence that Bishop had authority to contract on behalf of BEI and pledge the Property as collateral. Specifically, Landau takes issue with the Trust's failure to introduce evidence of any documented formal proceedings in which BEI gave Bishop such authority. Without such proof, Landau argues, there was insufficient evidence for the district court to conclude Bishop had authority. We disagree.

**{41}**    Although the district court did not specifically find that Bishop had authority to contract on behalf of BEI and pledge the Property as collateral, it found that Bishop and BEI executed the Mortgage and Note. Implicit in this finding is that Bishop had authority to contract on behalf of BEI and pledge the Property as collateral. Support for this conclusion comes from BEI's articles of incorporation, which listed Bishop as the sole incorporator and initial director. *See* NMSA 1978, § 53-11-35(A) (1987) ("All corporate powers shall be exercised by or under authority of, and the business and affairs of a corporation shall be managed under the direction of, a board of directors except as may be otherwise provided in the Business Corporation Act or the articles of incorporation.").

**{42}**    Landau argues that this evidence was insufficient to prove that Bishop had authority to sign the Note and Mortgage in 2007 because BEI's articles of incorporation were filed over sixteen years prior to Bishop's signing of the Note and Mortgage. However, Landau failed to present any evidence calling into question Bishop's authority to sign the Note and Mortgage on behalf of BEI. Without any evidence to the contrary, it was reasonable for the district court to infer from the articles of incorporation that Bishop, being the sole director of record, vested himself with authority to contract on behalf of BEI and pledge the Property as collateral. *See Robey*, 2017-NMCA-038, ¶ 10 ("In reviewing a claim of insufficient evidence, we . . . indulge all reasonable inferences in support of the prevailing party." (alteration, internal quotation marks, and citation omitted)).

## D.    Remaining Challenges

**{43}**    Landau additionally challenges three other findings. First, Landau appears to challenge the finding that "[Bishop] and [BEI] executed a Promissory Mortgage and Note" because he reads it to erroneously imply that: (1) the Note and Mortgage were one document and (2) Bishop executed the Note and Mortgage on behalf of himself in

---

8Neither party disputes that Bishop had the power to agree to the extension on behalf of BEI despite its cancelled certificate of incorporation. See § 53-16-24 ("The dissolution of a corporation does not take away or impair any remedy available . . . against the corporation . . . for any right or claim existing, or any liability incurred, prior to the dissolution . . . . The shareholders, directors and officers may take such corporate or other action as appropriate to protect the remedy, right or claim." (emphasis added)).

addition to BEI. Second, Landau challenges the finding that Bishop and BEI made sporadic payments on the Note up until 2017 because it was unclear who actually made the payments. Lastly, Landau challenges the finding that Bishop validly executed a personal guaranty to secure payment on the Note because the guaranty lacked consideration. However, Landau does not explain, and we fail to see, how any of these challenges (if successful) would change the district court's ultimate holding for which Landau seeks reversal (i.e., foreclosure of the Mortgage).

**{44}** In regard to the first argument, we fail to see how the district court's purportedly mistaken finding that the Mortgage and Note were one document and that Bishop also executed the Note and Mortgage on behalf of himself in addition to BEI would affect the validity of the Mortgage. As to the second argument, whether BEI or Bishop continued to make payments (or not) is of no import because, as discussed above, the Trust and BEI entered into an agreement in writing to defer the payment on the Note pursuant to Section 37-1-3(A), which tolled the statute of limitations. Consequently, evidence of continued payments was not necessary to revive the limitations period for foreclosing on the Mortgage pursuant to Section 37-1-16.

**{45}** In regard to the last argument, Bishop's personal guaranty only affects whether the Trust could go after him personally and does not affect the validity of the Mortgage. *See Guaranty, Black's Law Dictionary* (11th ed. 2019) (defining "guaranty" as "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance"). Accordingly, we fail to see how this finding is relevant to Landau's appeal. Given the foregoing, we need not address these arguments further. *See Sheraden*, 1988-NMCA-016, ¶ 10 ("It is well settled in New Mexico that the function of a reviewing court on appeal is to correct erroneous results, not to correct errors that, even if corrected, would not change the result.").

## V.    Issues Relating to Scheduling

**{46}** Landau raises two related arguments against the propriety of the district court's scheduling. We review the district court's management of its docket for an abuse of discretion. *See Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 88, 150 N.M. 283, 258 P.3d 1075.

**{47}** First, Landau argues the district court abused its discretion in setting trial less than a month after the discovery deadline because it did not give Landau sufficient time to request additional discovery, file dispositive motions, or prepare for trial. Yet Landau agreed to the district court's deadlines set at the scheduling conference and failed to request a continuance before trial. *See Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 56, 146 N.M. 853, 215 P.3d 791 ("In order to preserve an issue for appeal, [a party] must have made a timely and specific objection that apprised the district court of the nature of the claimed error and that allows the district court to make an intelligent ruling thereon.").

**{48}** Recognizing this lack of preservation, Landau points out that he was pro se at the time of the scheduling conference, and that the attorney he hired to represent him at trial did not comply with Landau's request to move for a continuance. In support of his latter contention, Landau points to an e-mail attached to his reply in support of his post-judgment motion to reconsider in which Landau asked his attorney if it was too late to seek a continuance on October 17, 2017.

**{49}** Landau's arguments fail for two reasons. First, "[p]ro se litigants must comply with the rules and orders of the court and will not be treated differently than litigants with counsel." *Woodhull v. Meinel*, 2009-NMCA-015, ¶ 30, 145 N.M. 533, 202 P.3d 126. Second, a party is bound by his attorney's actions unless he can demonstrate personal diligence that was thwarted by gross negligence of his attorney. *See Adams v. Para-Chem S., Inc.*, 1998-NMCA-161, ¶ 15, 126 N.M. 189, 967 P.2d 864. Landau has not demonstrated that his attorney's failure to request a continuance twenty-two days before trial was grossly negligent. Indeed, Landau stated in his reply in support of his motion to reconsider that his attorney did not request a continuance because he believed "that there was not enough time, that the [district c]ourt would not look favorably upon any such action and it appeared the [c]ourt was set against allowing any further time." Landau also stated that his attorney attempted to reach an agreement for a continuance with the Trust. Under these circumstances, we fail to see how Landau's attorney's actions were grossly negligent. Accordingly, Landau is bound by his attorney's failure to request a continuance, and consequently, his failure to preserve Landau's argument regarding the district court's scheduling.

**{50}** Next, Landau argues the district court abused its discretion in failing to set a pretrial deadline for dispositive motions and then striking Landau's motion for summary judgment as untimely. However, the district court was not required to set a deadline for dispositive motions. *See* Rule 1-016(B)(2) (providing that "a judge *may* . . . enter a scheduling order that limits the time . . . to file and hear motions" (emphasis added)). Moreover, the district court properly struck Landau's motion for summary judgment—filed five days before trial—as untimely because it did not provide sufficient time for the Trust to respond, nor did it provide the district court with reasonable time to dispose of the motion. *See* Rule 1-056(D)(1) NMRA ("Motions for summary judgment will not be considered unless filed within a reasonable time prior to the date of trial to allow sufficient time for the opposing party to file a response and affidavits, depositions or other documentary evidence and to permit the court reasonable time to dispose of the motion."). Although we understand there was little time between the discovery deadline and the trial, as explained above, it was incumbent on Landau to timely raise this issue. He failed to do so. Accordingly, we perceive no abuse of discretion in the lack of a pretrial deadline for dispositive motions and the striking of Landau's motion for summary judgment.

## VI. Equitable Issues Relating to Landau's Income From the Property

**{51}** Landau argues the district court erroneously based its judgment on equitable grounds relating to the rental income he made off of the Property after he purchased it.

Initially, we note it is unclear if the district court based its judgment on any equitable ground relating to Landau's rental income. While the court noted the purchase price and rental income of the Property in its findings, and ordered the Mortgage "foreclosed as a matter of law and equity[,]" it did not mention Landau's income anywhere else in its findings or conclusions.

{52}    Even if the district court did take the rental income into account, and even if this was improper (as Landau contends), Landau fails to demonstrate how the district court's ultimate ruling in favor of the Trust would have been different absent this consideration. As the district court concluded, the Trust timely brought its action to foreclose on a mortgage perfected prior to the date the tax lien on the Property arose. *See* § 7-38-70(B). Thus, Landau asks us to correct a purported error that, even if corrected, would not change the result of this case. This we will not do. *See Sheraden*, 1988-NMCA-016, ¶ 10 ("It is well settled in New Mexico that the function of a reviewing court on appeal is to correct erroneous results, not to correct errors that, even if corrected, would not change the result."). We therefore decline to address Landau's contention that the district court improperly considered his rental income in rendering its judgment.

## VII.    Cumulative Error

{53}    Finally, Landau claims that the district court's scheduling and failure to consider Landau's proposed findings and conclusions deprived him of a fair trial such that reversal is required, even if each alleged error is not reversible on its own. *See Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 57, 127 N.M. 47, 976 P.2d 999 ("Reversal may be required when the cumulative impact of errors during a trial is so prejudicial that a party was denied a fair trial."). As already stated, Landau failed to preserve the alleged errors relating to the district court's scheduling. Further, Landau's claim that the district court failed to consider his proposed findings and conclusions is without support in the record. Although the district court adopted verbatim the findings and conclusions included in the Trust's form of order, it did so only after Landau submitted his proposed findings and conclusions.

{54}    Without any evidence that the district court actually failed to consider Landau's proposed findings and conclusions—as opposed to considering and rejecting them—we presume the latter. *See Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063 (stating that the appellate court presumes that the district court is correct, and the burden is on the appellant to clearly demonstrate that the district court erred). For these reasons, we find no cumulative error. *See Coates*, 1999-NMSC-013, ¶ 57 ("[S]ince no prejudicial errors or irregularities exist in the points raised on appeal, no errors exist to cumulate in denial of a fair trial.").

## CONCLUSION

{55}    For the foregoing reasons, we affirm.

**{56}** IT IS SO ORDERED.

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**BRIANA H. ZAMORA, Judge**